# Staunton

AMANDA GRIFFIN V. FLOYD TOMLINSON, ET ALS.

September 22, 1932.

Present, Campbell, C. J., and Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Will H. Nickels,* for the appellant.

*S. H. Bond,* for the appellee.

EPES, J., delivered the opinion of the court.

This is a suit for partition which is here for the second time on appeal. See *Griffin* v. *Tomlinson,* 155 Va. 150, 154 S. E. 483.

James Tomlinson died intestate leaving eight children (Floyd Tomlinson, Elizabeth Lane, Thomas Tomlinson, Maudella Smith, Andrew Tomlinson, Amanda Griffin, Oma Qualls and Stella Qualls) and the children of a deceased son, General Tomlinson, as his heirs at law. At the time of his death he owned two tracts of land in Scott county, Virginia, the "Ridge Tract" containing about 154 acres, and the "Home Place" containing about 205 acres.

The two tracts are not contiguous and have very different characteristics. The "Home Place" fronts for approximately a half mile on State highway No. 411, and is not far from Pattonsville, where there is a high school. It is rugged, but it is not as rough as the "Ridge Tract" and it is better adapted for cultivation and much more desirable for a place of residence than the "Ridge Tract." The "Ridge Tract" is described in the evidence as being a tract of rough, steep, rocky ridge land, which lies a mile or more from a public road, and two miles or more from a public school.

James Tomlinson died early in 1926; and soon thereafter Floyd Tomlinson, Elizabeth Lane, Thomas Tomlinson, Maudella Smith and Andrew Tomlinson filed their bill in the Circuit Court of Scott county against Amanda Griffin and the other heirs of James Tomlinson, praying a partition in kind of these two tracts of land. The bill contains no allegation that any of the heirs has made improvements upon either tract, or has any equity entitling him or her to have any particular part of either tract allotted to him or her. It does contain an allegation that James Tomlinson had advanced to Stella Qualls $700, and prays that before she "shall be permitted to participate in the distribution of the property and estate of James Tomlinson," she be required to account for the sum so advanced to her; but this phase of the case is not involved on this appeal.

In April, 1926, Oma Qualls and Stella Qualls filed their answer. In it each alleges that during the lifetime of her father she had built a home for herself on the "Home Place" with his consent and under an understanding with him that she should have the land upon which her home was built; and asks that her share be so laid off as to include the improvements made by her without' charging it with any enhancement in the value thereof due to the improvements thereon.

In January, 1927, Amanda Griffin, by leave of court, filed her answer. In it she alleges that she is "now" living on her husband's land some distance from the main road and so far from a school that it is almost impossible for her to educate her children; and asks that her share, or a part thereof, be laid off to her in the "Home Place," so that she may have a home which will be accessible to school, church and road. She further alleges "that Stella Qualls and five of the other children and heirs at law of the said James Tomlinson have built their homes on the lands of the said James Tomlinson, and that all their improvements made thereon should be considered as real estate and charged against them in the partition of said real estate." She

does not, however, name the five children who, in addition to Stella Qualls, have built homes on this land.

A guardian *ad litem* was appointed for the children of General Tomlinson, all of whom were infants, and filed a formal answer for them.

On July 31, 1929, the cause came on to be heard on the pleadings above mentioned; and the court entered its decree appointing three commissioners to make partition "of the land of which James Tomlinson died seized * * * set forth in the bill." It directed them to partition the lands "into nine parts, as nearly equal as possible having reference to quantity and quality, value, ways and waters," and to assign one part to each of the eight living children of James Tomlinson, and one part to the children of his deceased son, General Tomlinson. It further directed the commissioners to lay off the shares assigned to each Stella Qualls and Oma Qualls so as to include the land on which she had built her home, and in valuing the share assigned her not to charge her with the value of the actual improvements made by her thereon. But it takes no cognizance of any improvements having been made on any of these lands by any of the other heirs, and contains no provision authorizing the commissioners in making a partition to disregard the value of any other improvements which were upon the land, or directing the commissioners as to how or where the share of any other heir should be laid off.

In December, 1929, the three commissioners, one of whom was the county surveyor, went upon these two tracts of land, made a survey thereof, and divided the "Home Place" into seven lots and the "Ridge Tract" into two lots, each of which lots they reported as being an one-ninth part of the lands of which James Tomlinson died seized. The seven lots laid off in the "Home Place" they assigned as follows: Lot No. 1, 22.10 acres to Stella Qualls; lot No. 2, 22.13 acres to Oma Qualls; lot No. 3, 19.07 acres to Floyd Tomlinson; lot No. 4, 27 acres to Maudella Smith; lot No. 5, 27 acres to Andrew Tomlinson; lot No. 6, 42.08

acres to Elizabeth Lane; lot No. 7, 46 acres to the children of General Tomlinson, deceased. The two lots laid off in the "Ridge Tract" they assigned as follows: Lot No. 8, 76[1] acres to Thomas Tomlinson; lot No. 9, 76 acres to Amanda Griffin.

Lots 1, 2 and 3 front on State highway No. 411. Lot 4 lies west of lot 3, lot 5 west of lot 4, lot 6 southwest of lot. 5, and lot 7 southwest of lot 6. Further than these facts, and the fact that lots 4, 5, 6 and 7 seem to be progressively (in the order named) less accessible from State highway No. 411, the report of the commissioners contains no information or suggestion as to the basis upon which the variations in the acreage of the nine lots were made. The report is silent as to what improvements, if any, are on the several lots, and as to whether the commissioners in estimating the value of the several lots regarded or disregarded the value of such improvements as are thereon.

Amanda Griffin, who alone excepted to the report of the partition made by the commissioners, alleged eight grounds of exception; but they may be restated and all embraced in the following three grounds:

(1) The lot assigned to her lies about one mile from a public road, and in order to get from it to a public road it is necessary to go across the lot assigned to Thomas Tomlinson. The commissioners disregarded this fact, and made no provision for a right of way from the lot assigned to her across the lot assigned to Thomas Tomlinson.

(2) The lot assigned to her is not equal in value to the shares assigned to the other heirs. Particularly it is not equal in value to the lot assigned to Floyd Tomlinson, which has on it two dwellings, the "one occupied by Floyd Tomlinson and the other in which your exceptor lives," and is

---

[1] In the report of the commissioners the acreage of lot 8 is given as 67 acres; but a resurvey by a second set of commissioners shows that it contains 76 acres, and 67 would seem to be. a typographical error.

worth more than three times the value of the lot assigned to her.

(3) The commissioners should have laid off her share, or at least a part thereof, so as to include therein the old James Tomlinson house which stands on the lot assigned to Floyd Tomlinson, which could be done without violating the rights of any of the other heirs.

In her exceptions she sets forth at length the facts upon which she relies to support the third ground of exception; but as may be gathered from the resumé of the evidences hereafter given, they need not be stated here.

All the evidence introduced for and against the confirmation of the report of the commissioners is in the form of *ex parte* affidavits. As no objection to the reading of these affidavits as evidence seems to have been taken in the court below, any objection to the use thereof which could have been made must be considered as having been waived by the adult parties.[2] But the fact that the evidence is presented in the form of *ex parte* affidavits deprives them of the full weight which regularly taken depositions have. *Adams* v. *Hubbard,* 25 Gratt. (66 Va.) 129, 134.

In support of the confirmation of the report of the commissioners the affidavits of thirteen persons were filed. The similarity of the statements made and the language used in these affidavits seem to indicate that they were prepared by the same person and submitted to the several parties who adopted them as their statements. The affiants depose

---

[2]In *Alderson* v. *Horse Creek Coal Land Co.,* 90 W. Va. 637, 111 S. E. 589, it was held that affidavits are admissible in support of an objection to the confirmation of a report of a partition in kind. In *McKown* v. *McKown,* 93 W. Va. 689, 117 S. E. 557, affidavits in opposition to the confirmation of the report of the commissioners were considered without comment. 47 C. J., Partition, §616, cites *Alderson* v. *Horse Creek, etc., Co., supra,* as authority for the statement that affidavits are admissible in such cases. Our attention has not been called to any other cases from Virginia or elsewhere which have so held; and good practice requires that the evidence for and against exceptions to the report of the commissioners be taken after due notice to the other parties.

that they are familiar with the land of which James Tomlinson died seized and with the several lots into which the commissioners have divided it; that in their opinion the commissioners have made a fair division of the land, and that the value of the share assigned to Amanda Griffin is equal to the value of any other share or as nearly so as the commissioners could have made it. These affidavits also state that James Tomlinson once lived on the land assigned to Amanda Griffin; that it has two orchards on it; that it is watered by two springs and a branch, and that "there is a road leading from it to the public road which was always traveled by James Tomlinson and has been used for a number of years." None of them makes any reference whatever to any improvements being upon any of the lots, or shows whether, in testifying that the value of the lot assigned to Amanda Griffin "is equal to the value of any other share," the affiant is considering the value of the lots with the improvements thereon, or of the land exclusive of the improvements thereon.

On the other hand Amanda Griffin filed the joint affidavit of herself and her husband, Joe Griffin, and the affidavits of six other persons. These affidavits also bear evidence that they were prepared for the affiants by some other person and adopted by them as containing their testimony.

As to the occupancy by Amanda Griffin of the old James Tomlinson house, which stands on the lot assigned to Floyd Tomlinson, the affidavits filed by her establish the following facts, which are not controverted. The house stands near the bank of the creek which runs along the eastern side of the "Home Place." In May 1927, there was a flood in this creek which changed the bed of the creek so as to turn it under the house, covered the floors with mud, filled the yard with mud, rocks and dirt, and so damaged the house that Thomas Tomlinson, who was then living in it, moved out. Soon thereafter she and her husband changed the bed of the creek back to its former location,

cleared the yard of debris, cleaned up and repaired the house so as to make it habitable, moved into it and have since lived there. The reason assigned by them for moving into this house is that they might be near a school to which they could send their large family of children.

They testify that they "spent considerable money, time and labor" in making the house and premises habitable, but do not state the value in dollars of the money and labor expended by them. Other witnesses place the amount at from $300 to $600, but do not show the source of their information on this point. After Amanda Griffin and her husband moved into the James Tomlinson house, they purchased a small tract of land adjoining the part of the "Home Place" on which the James Tomlinson house stands. They did this that they might have a place for a garden, pasture for a cow and other conveniences; and her husband has purchased and placed on this small tract a grist mill.

She and her husband testify that all these things were done by them relying upon the belief that her share would be laid off so as to include this house. The same statement is made in the affidavits of several other persons filed by her, but no facts or circumstances are testified to by her or by any of her witnesses which afford any basis for this belief, other than her desire that her share should be so laid off, or which estops any of the other heirs from denying that she is entitled to have the land upon which this house stands assigned to her.

With reference to the comparative value of the lot assigned to Amanda Griffin and those assigned to the other heirs, the testimony of her witnesses may be summarized thus: The lot assigned to Amanda Griffin would be high at $250; that they "would rather have the house in which Amanda Griffin lives and four or five acres of land around it, than the whole of the share laid off to Amanda Griffin." The share assigned to Thomas Tomlinson is worth two or three times as much as the lot assigned to her. All the other shares are worth from two to three times as much as that

assigned to her. The lot assigned to Floyd Tomlinson has on it two dwellings, one of which is occupied by Floyd Tomlinson and one by Amanda Griffin, and is worth at least $1,500. The land assigned Amanda Griffin is very rough and steep and not fit for cultivation, has no improvements on it, is a mile from any public road, two or three miles from a school, and the only way to get to a public road from the lot assigned to her is to go across the lot assigned to Thomas Tomlinson. Amanda Griffin is poor and not financially able to build a house on the land assigned to her.

Two of the affiants testify that "Floyd Tomlinson, Stella Qualls, Oma Qualls and several of the other children of the said James Tomlinson have all been assigned their share in the estate of James Tomlinson so as to include their dwelling houses," but they do not name the "other children" to whom they refer.

Amanda Griffin and her husband in their testimony make the statement that "they are ready and willing to give the sum of $500 difference to Floyd Tomlinson between the share laid off to him and the share laid off and assigned to Amanda Griffin; and that they will give $200 difference to Thomas Tomlinson between the share laid off and assigned to him and the share assigned to Amanda Griffin." The evidence does not show whether there are any buildings on the Thomas Tomlinson lot or not.

While the affiants who testify that the lots assigned to the other heirs are worth more than the lot assigned to Amanda Griffin do not so state (except in the case of the lot assigned to Floyd Tomlinson), the fair inference is that their estimates of the value of the several lots are the values thereof with the improvements thereon.

Amanda Griffin and her husband testified, without contradiction, that the commissioners, while making partition of the lands, went to the homes of the other heirs, spent the night with them, ate with them, and consulted with them as to where they wanted their shares laid off to them, but that none of them ever came to their home or consulted

them in any way about the partition or "showed them any respect at all while making said partition."

The trial court overruled the exceptions to the commissioners' report, and by its decree entered February 1, 1930, confirmed the partition made by them. From that decree Amanda Griffin appealed.

Upon that appeal this court was of opinion that the trial court should have refused to confirm the report of the commissioners because of their indiscretion in permitting themselves to be entertained by and in accepting undue courtesies from some of the heirs; and for that reason reversed the decree appealed from and remanded the cause for further proceedings to be had therein. In reversing the decree this court in its opinion said (*Griffin* v. *Tomlinson,* 155 Va. 150, 155, 154 S. E. 483, 484) :

"In view of what has been said, which leads to a reversal of the decree entered by the circuit court, it is unnecessary to enter upon a discussion of the remaining assignments of error, except to say that we are of opinion that the court erred in refusing to sustain the exception that the commissioners failed to provide by specific designation a means of ingress and egress to and from the lands assigned to appellant."

Upon the cause being remanded (it having been suggested that Oma Qualls had died intestate), it was revived in the names of her husband and her five chlidren (all infants), and a guardian *ad litem* appointed for these infants, who filed a formal answer for them.

Thereupon the cause came on to be heard on the proceedings hereinbefore mentioned; and the court, on January 31, 1931, entered its decree appointing five new commissioners to go upon these lands and make partition thereof. The provisions of this decree are identical with those of the decree of July 31, 1929, above set forth, except that the commissioners are directed to assign the share of Oma Qualls to her children, subject to the rights of her husband therein.

The five commissioners went upon the two tracts of land, had them resurveyed and made, for all practical purposes, the same partition thereof which had been reported by the former commissioners. They divided the "Home Place" into the same seven lots and the "Ridge Tract" into the same two lots; and, though they changed the numbers assigned to the several lots, they assigned each lot to the same person to whom it had been assigned by the former commissioners.

In assigning to Amanda Griffin and Thomas Tomlinson the two lots cut from the "Ridge Tract" the commissioners make this provision: "It is further agreed that the said Amanda Griffin shall have a right of way of sufficient width along an old road that was used by James Tomlinson (dec.) over the land assigned to Thomas Tomlinson and known as lot No. 2 for the use and benefit of the above described land."

In assigning the lots cut from the "Home Place" they make this provision: "It is further agreed that there shall be a road or right of way of sufficient width running with a road that was used by James Tomlinson (dec.) in his lifetime along the boundary lines of lot No. 5, assigned to Floyd Tomlinson and over and through lots Nos. 6, 7 and 8 assigned to Maudella Smith, Andrew Tomlinson and Elizabeth Lane for the use and benefit of each and all parties that were assigned shares in tract No. 2," (i. e., the "Home Place") "that may have use for same, * * *."

These commissioners in their report give no information as to the basis upon which they arrived at the acreages to be included in the several lots; and the report does not show what improvements are on the several lots, or whether in estimating the value of the lots the commissioners regarded or disregarded the value of the improvements thereon. The only thing in their report which even suggests that any of the lots have any improvements thereon are the following symbols which appear on the plat returned with the report: On the lots assigned to Stella Qualls, Oma Qualls and Floyd Tomlinson appear two small

hollow squares such as surveyors commonly use to symbolize a house. On the lots assigned to Maudella Smith and Andrew Tomlinson appear one such square; on the lot assigned to Elizabeth Lane one such square is drawn across one of the southwestern boundary lines with the words "Church House" opposite it.

The first, second and fifth grounds of exception are not of sufficient merit to require consideration. The third and fourth grounds of exception are, to all intents and purposes, the same as the second and third grounds assigned in opposition to the confirmation of the report of the former commissioners, and need not be restated here.

No new evidence material to these two grounds of exception was taken; but the affidavits filed in support of and against the confirmation of the report of the former commissioners were treated as evidence submitted for and against the report of the second set of commissioners.

The court overruled the exceptions to the report of the second commissioners, and by its decree entered August 11, 1931, confirmed that report and the partition therein reported. From this decree Amanda Griffin has appealed.

The grounds of error assigned by her raise the same points which are raised by her exceptions to the report of the commissioners; and she assigns as an additional ground of error that the court erred "in confirming the report of the commissioners without giving her compensation for the improvements which she made on the common property."

The interlocutory order appointing commissioners to make a partition of land forms the basis upon which they are to proceed to make the partition. Unless otherwise provided by statute or a decree of the court, they have no other duty to perform, or authority to act, than to divide the land among the cotenants acording to their respective rights and interests as found and determined by the court, and to make report of their proceedings. Freeman on Cotenancy and Partition, §522; 47 C. J. §560, p. 496; Hogg's Eq. Prin. §376; *Croston* v. *Male*, 56 W. Va. 205, 49 S. E. 136, 107

Am. St. Rep. 918; *Brown* v. *Bulkley*, 11 Cush. (Mass.) 168. See, also, *Reed* v. *Murphy*, 196 Cal. 395, 238 Pac. 78.

■ Whether a cotenant is entitled to have equitable compensation for improvements which he claims to have made on the common property is primarily a question for the court. Good practice, at least, requires that such questions should be settled by the court before or at the time it appoints commissioners to make a partition of the property. There are some cases which hold that the court may with propriety authorize the commissioners to hear, inquire into and determine such questions (*McCutchen* v. *McCutchen*, 77 S. C. 129, 57 S. E. 678, 12 L. R. A. [N. S.] 1140) ; but unless the court has given the commissioners such authority, such inquiries are beyond the scope of their duties.

■ Where the court has neither adjudged that a cotenant is entitled to equitable compensation for improvements, nor authorized the commissioners to hear, inquire into and determine whether any of the cotenants are entitled to allowances for improvements, it is the duty of the commissioners to make partition of the land as it is, including the improvements thereon, in accordance with the rights of the parties as determined by the decrees of the court; and in valuing the several parts of the land they should value each part with the improvements thereon. If they assume to hear, inquire into and determine claims of cotenants for allowances for improvements, and then make a partition making such allowances for improvements as they deem proper, they exceed their authority.

■ When commissioners have been ordered to partition a tract of land equally among cotenants, and report that they have done so without showing that they have made allowances for improvements, if the report be excepted to on the ground that the partition is not an equal partition, and the evidence introduced in support of such exception clearly establishes that the value of the part assigned to another, when valued with the improvements thereon, is materially greater than that assigned to the exceptor, he

has made out a *prima facie* case entitling him to have the report set aside. If, to sustain the report, the cotenant, whose part is of the greater value, relies upon unauthorized acts of the commissioners in making allowances to him for improvements, the burden rests upon him to establish by proper proof that he is entitled to such allowance for improvements, and that when such allowance is made the partition reported is just and equitable; and generally speaking he must have specifically pleaded these facts to entitle him to have the report confirmed. The burden rests upon a cotenant claiming to be entitled to an allowance for improvements to prove his claim, and he is not relieved of that burden by the unauthorized act of the commissioners in making him an allowance therefor. To sustain this burden the pleadings and the evidence must be sufficient to warrant the court, if it were then appointing commissioners to make a partition, in entering a decree adjudging that the claimant is entitled to an allowance for improvements, and directing the commissioners to make such an allowance, and to prove that when such allowance is made the partition reported is just and equitable. In such a case there is no presumption that the commissioners have correctly determined the equities between the several cotenants relative to allowances for improvements, and that, therefore, the partition reported by them is just and equitable.

Oma Qualls and Stella Qualls in their answer asserted their right to equitable compensation for improvements made by them on the common property, and asked that they be allowed these improvements; and the court in its decree directed that their shares be so set off as to include the improvements made by them and that they be not charged therewith. Presumably the commissioners have obeyed the mandate of the court in this respect, though their report does not affirmatively show that they have done so.

Generally speaking, a cotenant who in a partition suit seeks equitable compensation for improvements

which he claims to have made upon the common property, must specifically plead his claims therefor (*Ivy* v. *Ivy* [Tex. Civ. App.] 128 S. W. 682; *Rhodes* v. *Rhodes,* 78 Ill. App. 117; *Reynolds* v. *Adams,* 125 Va. 295, 99 S. E. 695); but where permanent improvements are treated by the parties in their testimony as being improvements for which one of the cotenants is entitled to equitable compensation, such compensation may be allowed even though the party entitled thereto does not set up any claim therefor in his pleadings. 47 C. J., Partition, p. 492.

None of the appellees (other than Oma Qualls and Stella Qualls) has made any claim for equitable compensation for any improvements on the property either in the pleadings or in the evidence. On the other hand, Amanda Griffin in her answer has specifically alleged, in effect, that none of the appellees is entitled to equitable compensation for any improvements made on the property; and has not in her testimony, or other testimony introduced by her, treated any of the improvements which are mentioned as having been made by the appellees as being improvements for which they are entitled to equitable compensation.

The court in its decrees had not authorized the commissioners to disregard the value of any improvements on the land, other than those made by Oma Qualls and Stella Qualls, or to make equitable compensation in any form to any other person for any improvements. Nor did it authorize them to hear, inquire into and determine claims which might be made before them as to the right of any person to have a particular part of the land laid off to him without charging him for the improvements thereon.

The commissioners in their report do not disclose that in making partition they have assumed the power to make equitable compensation to any of the heirs for improvements placed on the property by them. But in the light of the evidence, it is impossible to escape the conclusion that the lot assigned to Floyd Tomlinson, when valued with its improvements, is much greater than the value of the lot assigned to

Amanda Griffin. This would seem to be true also with reference to some of the other lots laid off in the "Home Place" which are assigned to heirs other than Floyd Tomlinson, Oma Qualls and Stella Qualls.

It may be that (in addition to Oma Qualls and Stella Qualls) Floyd Tomlinson and some of the other appellees are also entitled to equitable compensation for improvements placed by them upon these lands, which equities, if given effect, render the partition in question just and equitable; but they have not either pleaded or proved this in the record here before us. It follows, therefore, that the decree of August 11, 1931, appealed from must be reversed, and the cause remanded for further proceedings to be had not in conflict with the views above expressed and the directions below given.

The court will proceed to settle the several rights of the heirs to equitable compensation for improvements made by them, respectively, on the common property. Having done this, it will direct the same commissioners, or in its discretion new commissioners appointed by it, to make and report a partition in accordance with the decrees of the court, making no allowances or equitable compensation for any improvements except such as the court shall have ordered to be made. No assignment of error has been made on the ground that the court erred in the allowances for improvements decreed by it to Oma Qualls and Stella Qualls. The court will, therefore, direct them to assign to Stella Qualls *her share* or *a part thereof,* so as to include the improvements which she has made on the common property; and will make a like provision with reference to the share of Oma Qualls, which has descended to her children, subject to the rights of her husband.

The court will permit any party who promptly proceeds to do so to file any additional pleadings and take any additional evidence he may be advised is necessary or proper to present to the court and establish any right he may claim to have for equitable compensation for improvements made

by him upon the common property; and the court will give a reasonable opportunity to any party to controvert by pleadings and evidence any claim for equitable compensation for improvements which are asserted by any of the other heirs.

 Generally speaking, one cotenant is not entitled to equitable compensation for improvements or repairs made on the common property after suit for partition has been instituted, unless they are made under some peculiar circumstances which estop his cotenants from denying to him equitable compensation therefor in a partition; and the mere fact that the improvements or repairs were made with the knowledge or even the consent of his cotenants is not sufficient to work such an estoppel. 47 C. J., Partition, §498; *Hall* v. *Collier,* 146 Ga. 815, 92 S. E. 536; *Eldridge* v. *Wolfe,* 129 Misc. 617, 221 N. Y. S. 508. Nor can one coparcener by his occupancy of a part of the common property after suit for partition has been instituted, or by his own acts done thereafter, acquire any equity entitling him to have any particular part of the common property partitioned to him, unless his other coparceners have done something with reference thereto to estop them from asserting that he is not entitled to have such part set off to him.

 Applying these principles, we are of opinion that the record now before us is not sufficient to establish the right of Amanda Griffin to equitable compensation for any repairs or improvements which she may have made to the James Tomlinson house and its premises, or any equitable right to have her share laid off so as to include that house. She has, however, shown that if her share, or a part thereof, is assigned to her from the "Home Place" tract it would be more valuable to her than if her whole share is assigned to her in land laid off from the "Ridge Tract." This being so, unless the court shall be of opinon from evidence hereafter introduced that to assign to Amanda Griffin a part of the "Home Place" will do an injustice to some of the other heirs and that it cannot be done with

due regard for the rights and equities of the other heirs, it will order the commissioners to consider whether her share, or a part thereof, can be laid off so as to give her a part of the "Home Place" tract, without injustice to and with due regard for the rights and equities to which it may have determined that the other heirs are entitled, and if so, to so lay off her share as to give her some part of the "Home Place" tract as a place for her residence.

Where it is necessary or proper to provide for a right of way for one lot of land across another lot, the court will, in accordance with the view expressed by this court in its former opinon in this case, direct and require the commissioners to provide for such rights of way by *specific designation* both as to the course and width thereof; and, if required by any party in interest, will require the course thereof to be designated by courses and distances. The designation of a right of way as a "right of way of sufficient width, along an old road that was used by James Tomlinson" is not, either as to the designation of the width or course of the right of way, a sufficient compliance with the direction of this court that the right of way be provided *"by specific designation."*

Two surveys have now been made of the outside lines of these two tracts, and unless good cause be shown for ordering otherwise, the court will direct the commissioners not to make a resurvey of these outside boundaries, but to accept as the basis for the partition to be made by them the plat and survey thereof made by the commissioners appointed by the decree of January 31, 1931.

*Reversed and remanded.*