Present:  All the Justices

MARY VILLON DE BENVENISTE

v.  Record No. 082387     OPINION BY JUSTICE DONALD W. LEMONS
                                    September 18, 2009
AARON CHRISTENSEN FAMILY, LP, et al.

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Burke F. McCahill, Judge

In this appeal, we consider whether a trial court may require a cotenant to share expenses that result in an increase in the value of real property, despite the fact that the investment does not result in "permanent" physical improvements to the property.  We also consider whether such an award, if otherwise permissible, should be barred by the doctrine of unclean hands under the circumstances presented here.

I.  Facts and Proceedings Below

This appeal arises from a dispute among four siblings and other assorted family members concerning the disposition of a large farm in Loudoun County, inherited from the siblings' parents.  The parcel, known as Mountain Gap Farm ("the Property"), was owned at the outset of the period relevant to these proceedings by Dr. Aaron W. Christensen, who held a 51.12017% interest, and his wife, who held a 48.87983% interest.  In 2000, Dr. Christensen created the Aaron W. Christensen Family Limited Partnership ("the Partnership");

Dr. Christensen was the sole general partner, while he and his four children, Judith L. Pohlman, Carol J. Bartholomew, John N. Christensen, and Mary Villon de Benveniste ("Mary"), were all named as limited partners. The Partnership held title to Dr. Christensen's portion of the Property during the remainder of his life. During Dr. Christensen's life, he made annual gifts of his partnership interests to his children and grandchildren, so that by the time of his death, all of the ownership shares in the Partnership were held by his four children and members of their families. The Partnership continued to hold title to 51.12017% of the Property's ownership. Mrs. Christensen's 48.87983% ownership interest passed, by way of a testamentary trust, to the four children in equal 1/4 shares. As a consequence of these transfers, at all times relevant to the dispute at issue here Mary held approximately 25% of the ownership interest in the Property, while her siblings and their children (collectively, "the Christensens") held the remaining 75%.

Following their parents' deaths, Mary and the Christensens investigated a division of the Property into four approximately equal parcels. However, John Christensen discovered that there were 71 approved drainfields on the Property, and also learned that the Property might soon be

subject to downzoning.[1]  To take advantage of the drainfield approvals, the Christensens decided to begin the process of subdividing the Property into as many lots as possible (which proved to be 68 lots) before the expected downzoning would prevent them from doing so.  Mary sent letters to the Christensens informing them that she was "not interested in subdividing or developing and selling the farm."

The Christensens, acting through the Partnership, nonetheless hired an engineering firm to complete surveys and other engineering work necessary to move forward with the subdivision, at a cost of approximately $650,000.  Both John Christensen and the attorney hired by the Partnership to advise it in pursuing subdivision explained to Mary that they understood her desire for a four-lot division, but needed to pursue the 68-lot subdivision to avoid devaluation of the Property due to downzoning.

John submitted a land development application to the Loudoun County Department of Building and Development that listed the Partnership as the sole owner of the Property. However, at the time of this application, the Partnership only

---

[1] "Downzoning" is a zoning action that results "in a reduction in a formerly permitted land use intensity or density."  Board of Supervisors v. Greengael, L.L.C., 271 Va. 266, 285, 626 S.E.2d 357, 368 (2006) (citing Turner v. Bd. of County Supervisors, 263 Va. 283, 289, 559 S.E.2d 683, 686 (2002) and Code § 15.2-2286(A)(11)).

3

held title to 51.12017% of the Property's ownership, while each of Dr. Christensen's four children held title to 12.2199575% (or 25% of Mrs. Christensen's original ownership). The application also explicitly required the signatures of "all property owners." The county approved the preliminary plan. The Christensens did not send Mary demands that she pay for a share of these expenses related to subdivision because she had stated she would not pay them; however, John Christensen testified that Mary was kept fully informed of the Christensens' subdivision efforts and at times expressed approval of those efforts.

The Christensens eventually filed suit against Mary, seeking allotment of the Property, a sale in lieu of partition, or a partition of the Property. At trial, the Christensens' appraiser testified that the value of the Property as a single, undivided lot (without the preliminary subdivision plan) was $4,800,000, while the value of the Property "as 68 potential lots with the preliminary subdivision plan in place" was $8,895,000. This enhancement of appraised value due to the preliminary subdivision plan was accepted by the trial court in a finding of fact. The trial court held that Mary was obligated to pay a share of the expenses related to obtaining the preliminary subdivision plan and permitted the Christensens the opportunity to purchase the

4

entire Property. The trial court ordered that should the Christensens not purchase the Property, it would be sold and the proceeds divided, with Mary's proceeds reduced by her share of the subdivision plan expenses. The Christensens ultimately did not purchase the Property, and following a deterioration in the real estate market, it was eventually sold to a third party for $6,000,000. The trial court approved the sale and ordered that a portion of Mary's share of the proceeds, $147,277.72 representing her share of the expenses of the subdivision plan, be held in escrow pending her appeal.

We awarded Mary an appeal on the following two assignments of error:

1. The Trial Court erred in charging a portion of the cost of the subdivision process for the Property to Mary because the "improvements" are not permanent.

2. The Trial Court erred in requiring Mary to pay a pro rata share of the subdivision costs because the Appellees do not have clean hands.

## II. Analysis

### A. Right to Compensation for Improvements

Mary first claims the trial court erred in requiring her to pay, out of her profit from the partition sale ordered by the trial court, a share of the Christensens' expenses to obtain the subdivision plan. She maintains that because this

5

investment was not a "permanent improvement" under Virginia law, she is not liable for these costs.

The evidence relating to the subdivision plan and the Christensens' efforts to obtain it is undisputed. The question presented is whether the enhancement of value due to the Christensens' efforts is a compensable "improvement" within the meaning of our prior cases. The resolution of this question is a matter of law; consequently, we review the issue de novo. Alcoy v. Valley Nursing Homes, Inc., 272 Va. 37, 41, 630 S.E.2d 301, 303 (2006).

It has long been a principle of law in Virginia that

> [g]enerally, a joint tenant who at his own expense has constructed permanent improvements on property owned in common is entitled in a partition suit to compensation for the improvements, even in the absence of a showing that his cotenant assented thereto. The rule is founded on the desire of the court to do justice and to prevent unjust enrichment of one cotenant at the expense of the other. But in a partition suit the amount of the compensation, in the absence of an agreement with the other tenant or tenants, is limited to the amount by which the value of the property owned in common has been enhanced by the improvement.

Jones v. Jones, 214 Va. 452, 454-55, 201 S.E.2d 603, 605 (1974). In most of the cases in which we have applied this rule, our recitation of the legal principles has included the term "permanent improvements." See Butler v. Hayes, 254 Va. 38, 43, 487 S.E.2d 229, 232 (1997); Quillen v. Tull, 226 Va.

6

498, 502, 312 S.E.2d 278, 280 (1984); Jones, 214 Va. at 454-55, 201 S.E.2d at 605; Shotwell v. Shotwell, 202 Va. 613, 618, 119 S.E.2d 251, 255 (1961); Dalgarno v. Baum, 182 Va. 806, 808, 30 S.E.2d 559, 560 (1944); Griffin v. Tomlinson, 159 Va. 161, 179, 165 S.E. 374, 380 (1932); Ballou v. Ballou, 94 Va. 350, 352, 26 S.E. 840, 840 (1897).

Most often the cases applying this principle have dealt with "permanent improvements" in the form of physical construction or repair, often of a structure intended for residence.  See, e.g., Butler, 254 Va. at 44, 487 S.E.2d at 232; Jones, 214 Va. at 453, 201 S.E.2d at 604; Shotwell, 202 Va. at 615, 119 S.E.2d at 253; Dalgarno, 182 Va. at 807, 30 S.E.2d at 559; Ballou, 94 Va. at 351, 26 S.E. at 840.  However, in Quillen we reviewed a judgment partitioning land on Chincoteague Island among various parties with ownership interests.  226 Va. at 500-01, 312 S.E.2d at 278-79.  The land at issue consisted of four parcels, designated A, B, C, and D. Id. at 501, 312 S.E.2d at 279.  The trial court ordered Parcels C and D to be sold at public auction and the proceeds divided, with Tull, the party who had been in possession of the property, receiving credit for enhancing its value by 30 per cent.  Id.  The enhancement was in the form of easements Tull purchased over adjacent property, which were the only means of accessing Parcels C and D.  Id. at 502, 312 S.E.2d at 280.

7

Applying the principle of compensation for permanent improvements, we affirmed the trial court's judgment, noting that

> [t]here was evidence that the value of parcels C and D was enhanced approximately one-third or more by Tull's acquisition of the easements. Accordingly, we hold that there was evidence to support the court's finding that the value of these parcels was enhanced by 30 per cent and its ruling that Tull was entitled to credit for such enhancement. We will not disturb the finding or the ruling.

Id. at 503, 312 S.E.2d at 280. Purchased easements such as those at issue in Quillen are not physical improvements like the houses constructed in other compensation cases; indeed they are not even tangible assets and are not located on the property being partitioned. Nonetheless, we have considered an easement to be sufficiently "permanent" to require cotenants to pay a share of its cost.

Other courts, applying equitable principles, have held an award of credit to a cotenant to be appropriate for improvements that are not obviously "permanent," but which have resulted in an increase in the value of the property that was subsequently realized by partition sale. For example, in Leinweber v. Leinweber, 385 P.2d 556, 557-58 (Wa. 1963), the Supreme Court of Washington reversed a trial court's judgment denying credit for "summer fallowing" (plowing and weeding agricultural land in preparation for the next year's crop).

8

Although the summer fallow could be reversed through later neglect, the court treated the practice as an improvement, placing particular emphasis on evidence indicating that the purchaser of the land at the partition sale included the additional value for the summer fallow in his bid. Id. at 557. The court concluded that

> [w]hen consideration is given to the fact that [the] summer fallowing was not only necessary, but also substantially enhanced the valuation of the property, and such increased valuation was realized upon the partition sale instigated by the other cotenants, it seems appropriate to treat the summer fallow as an improvement, even though it was not permanent in nature.

Id. at 558 (emphasis added). Implicit in this analysis is the principle that the increase in value, irrevocably realized by the cotenants at the time of the partition sale, rendered the improvements sufficiently "permanent" for a court to require compensation for them.

In this case, the trial court did not err in reaching the same conclusion. Although the fruits of the efforts undertaken by the Christensens to obtain a preliminary subdivision plan were as intangible as the easements in Quillen, they likewise benefited the Property's value. Like the summer fallow in Leinweber, the subdivision plan could be allowed to lapse and thus lacked a degree of permanence, but this factor weighing against requiring an allowance was overcome when the benefiting

9

property was sold and the increase in value was realized by the cotenants. Although Mary now disputes that the subdivision plan increased the value of the Property, the trial court made an explicit factual finding to the contrary, and Mary has not assigned error to that finding. For the purposes of this appeal, we must accept the trial court's factual finding that the subdivision plan increased the value of the land, and that this increase was realized when the Property was sold. Accordingly, for the purposes of equitably dividing the proceeds from the partition sale among the parties here, the trial court did not err in treating the Christensens' securing of a preliminary subdivision plan as a "permanent improvement" and requiring Mary to pay her share of the associated expenses.

## B.    Unclean Hands

Nonetheless, Mary contends that, even if the improvements are of the sort for which compensation may generally be required, the Christensens are not entitled to such compensation because of the equitable doctrine of unclean hands. According to Mary, the Christensens were aware at all relevant times that she opposed the subdivision plan and acted without her consent in obtaining it.

We have established that

> [t]he allowance ordinarily given a cotenant for
> permanent improvements upon real estate that is
> ultimately partitioned is not a legal right.

10

> Rather, compensation of this kind is allowable
> to enable a court of equity to do justice and to
> prevent one tenant from becoming enriched at the
> expense of another.

Butler, 254 Va. at 43, 487 S.E.2d at 232 (citing Shotwell, 202 Va. at 618, 119 S.E.2d at 255). Consequently, we review the decision of a trial court to award or deny such equitable relief for an abuse of discretion. Id. at 44, 487 S.E.2d at 232.

To support her unclean-hands argument, Mary relies on Butler, contending that the factual similarities between that case and the current controversy suggest the same result: that those seeking compensation be denied it because of their inequitable conduct. In Butler, buyers purchased land purportedly owned by the seller alone. However, the seller claimed sole ownership by a deed he had fraudulently prepared by forging the signatures of his cotenants. Id. at 40, 487 S.E.2d at 230. Despite having been informed of the fraud, which left them with only a fractional share of ownership, the buyers substantially improved the property, and then sought an allowance from the cotenants when the trial court ordered that the property be partitioned. Id. at 41-42, 487 S.E.2d at 231. The trial court refused compensation because the buyers "had actual notice of an infirmity in their title, and they did not place the improvements on the property in good faith." Id. at

11

42, 487 S.E.2d at 231.  We affirmed the trial court's judgment.  Id. at 45, 487 S.E.2d at 233.

The conduct of the Christensens here does not compare to the conduct of the buyers in Butler.  It is true that the application signed by John Christensen on behalf of the Partnership explicitly required all owners to sign and the engineer who filled out the application for the Christensens knew the signatures of all of the owners were required, and that Mary expressly indicated her opposition to subdivision several times.

However, there was also evidence that Mary was kept fully informed about the Christensens' pursuit of the subdivision plan and that she also expressed approval of and satisfaction with the Christensens' progress.  For example, Mary's brother John Christensen, who managed the subdivision application process, testified that Mary "was very happy" about the discovery of county-approved drain fields on the property, which would enable a valuable subdivision provided the plan was approved before the impending downzoning of the property. According to John, although Mary later voiced some concern about the "risk" involved in pursuing subdivision, she did not object to subdivision at the time the drain fields were discovered.

John also testified that Mary repeatedly changed position as to her desires for the ultimate disposition of the property:

> We spent a lot of time and an awful lot of money trying to settle this issue with my sister. Asking her what she wanted. At certain times she wanted her section of the property.
> At certain times she wanted to be bought out. Certain times she wanted the western side of the property. Certain times she wanted the eastern part of the property . . . and now she wants to throw away the preliminary plan and wants the center part of the property.

Finally, John described Mary's reaction to the approval of the preliminary subdivision plan as "ecstatic," and said she commended him for doing "a wonderful job."

On cross-examination, Mary herself admitted that she told John his discovery of drain fields (a necessary precursor to subdivision) was "great." She also acknowledged a letter in which she expressed interest in receiving one-quarter of the property but also purchasing her siblings' shares of her parents' house, and expressed a variety of opinions as to whether the property could be feasibly partitioned in kind, and as to which section she would like to receive if such a partition were possible.

With regard to the vitality of the family partnership during the period in question and its authority to apply for a subdivision plan, Mary admitted she wrote a capital

contribution check for the partnership after the time at which she now contends the partnership was dissolved and had no authority to seek subdivision, and that during the same period she volunteered to serve as a managing general partner.

The trial court, in announcing its initial ruling from the bench, credited John's testimony as confirmed by Mary's admissions that she did not consistently oppose the pursuit of the subdivision plan.  For example, the trial court noted that John Christensen "believed that [Mary] would at times equivocate and that she didn't have the money to invest in the engineering costs. . . .  I summarize and believe that overall there were some equivocations, some missed[2] signals that he received from his sister."  The trial court later referenced Mary's indecision about how the property should be divided, noting that Mary "had a hard time making the selection," and again referring to her actions as "equivocation."  In denying Mary's motion to reconsider, the trial court rejected her unclean-hands argument, citing among other things the evidence of "mixed signals" by Mary.

Instead of proceeding with their improvements in the face of notice of serious defects in their title like the buyers in

_____

[2] It is unclear whether the court reporter erroneously took down "missed" rather than "mixed," which appears several times elsewhere in the transcript of the court's ruling; the latter would be more consistent with the trial court's description of "equivocations."

*Butler*, the Christensens were majority owners of the property, seeking to maximize value despite Mary's mixed feelings about subdivision.  This conclusion is supported by testimony, accepted by the trial court, that the Christensens were facing imminent downzoning that would diminish the value of the Property absent subdivision.

Contrary to Mary's argument, the submission of the subdivision plan application in the sole name of the Partnership does not provide a basis for reversing the trial court's holding regarding the issue of unclean hands.  Mary did not ask the trial court to declare the subdivision plan invalid on the basis that the Partnership lacked the necessary authority to submit it.  Nonetheless, she argues that she should not be credited for a share of the costs incurred because of alleged procedural defects in the application.  The trial court rejected this argument when it was presented in Mary's motion to reconsider and concluded that even if there were formal defects in the application, such defects would not constitute unclean hands in light of Mary's "mixed signals" regarding the subdivision process.

Considering the evidence in its entirety, the trial court did not abuse its discretion in holding that preclusion of compensation based upon the doctrine of unclean hands was not appropriate in this case.

15

## III. Conclusion

We hold that the preliminary subdivision plan obtained by the Christensens in this case was a compensable improvement of the property and the trial court did not abuse its discretion in requiring Mary to compensate the Christensens for a share of their expenses related to the increase in value associated with the improvement.  We also hold that the trial court did not abuse its discretion when it held that the Christensens were not precluded from seeking such compensation from Mary because of the doctrine of unclean hands.  Accordingly, we will affirm the judgment of the circuit court.

<u>Affirmed</u>.