Present:  All the Justices

BOARD OF SUPERVISORS OF CULPEPER COUNTY

v.  Record No. 050461     OPINION BY JUSTICE ELIZABETH B. LACY
                                          March 3, 2006[1]
GREENGAEL, L.L.C., ET AL.

FROM THE CIRCUIT COURT OF CULPEPER COUNTY
J. Howe Brown, Jr., Judge Designate

This case involves a decision of the Board of Supervisors
of Culpeper County denying approval of a preliminary
subdivision plat and its subsequent decision to rezone that
property from residential to light industrial use.

FACTS

In 1999, Ashmeade Company, L.L.C., purchased a parcel of
approximately 96 acres (the Property) in Culpeper County (the
County).  The Property was zoned R-4, allowing high-density,
multi-family residential use.  In 2000, the Culpeper County
Board of Supervisors (the Board) amended its Comprehensive
Plan, re-designating the Property as "future industrial."  It
did not rezone the Property at that time.

Greengael, L.L.C., (Greengael) became the contract
purchaser of the Property on August 1, 2002.[2]  Greengael

_____

[1] This opinion was revised on May 26, 2006.
[2] Ashmeade Company, L.L.C., originally executed a contract
for sale of the Property with DESYD, L.L.C., on March 5, 2002.
Douglas Darling, Principal of DESYD, signed the contract.
Darling formed Greengael, L.L.C., in June 2002, and DESYD
assigned its March 5, 2002 contract to Greengael.  Darling, as
a member of Greengael, represented Greengael throughout the

planned to build a mixed-residential development (the Development). Sections 5C-2-1.1 and 5C-2-1.3 of the County's zoning ordinance required that all dwellings in the R-4 zone receive "serv[ice from] an approved public water and sewer system of adequate capacity . . . operated by a municipality or public service corporation duly authorized by the Commonwealth of Virginia." The County's subdivision ordinance required the developer to file a preliminary subdivision plan. Sections 425.3.1 and 425.4.1 of the subdivision ordinance required that the developer include as part of the subdivision plan "a letter from the agency, authority, or utility which states that it can adequately serve the subdivision" with water and sewage facilities, respectively (hereinafter "the utility letter").

Greengael first approached the County seeking water and sewer service for the Development. In a May 3, 2002 letter to the Culpeper County Administrator, Frank Bossio, Greengael requested 1,100 water and sewer taps for use "in a mixed office/commercial/apartment project." The Culpeper County Planning Director, John C. Egertson, replied to Greengael by letter on May 21, 2002, stating that the Development was not

negotiations with the Town and County and the legal proceedings. In this opinion, "Greengael" refers to the collective actions of Greengael, L.L.C., and of Douglas Darling.

2

"in a position to be served" by the County "at this time." Egertson further explained that a Memorandum of Understanding between the County and the Town of Culpeper (the Town) was in place outlining the potential purchase of water and sewer service capacity by the County from the Town, but that a formal agreement had not been drafted. Egertson explained that "it would be premature" for him "to speculate" regarding whether the Development could receive service. Egertson acknowledged that water and sewer service would be feasible in the area but "there are many issues to be resolved," notably "[c]apacity will be an issue as will the proposed land use which conflicts with the Culpeper County Comprehensive Plan."

Greengael then went to the Town to secure water and sewer service for the Development. By letter dated September 9, 2002, the Town Engineer and Planning Director, Charles Stephenson, rejected Greengael's first application because it was incomplete. In that letter, Stephenson suggested that Greengael "may want to research the area with the County to determine whether it is envisioned to be served by Town or County utilities and whether the potential development will likely be approved." Greengael submitted a second application to the Town on September 18, 2002, along with a letter stating that it did "not believe that any notification of the County

authorities is necessary" and that it would not contact the County.

In its application to the Town, Greengael stated that the Development would use approximately 100,000 gallons of water per day and generate the same amount of waste, that it would use "the current pump station behind the Teves property," and that no change or modification to the facility was anticipated. Greengael also stated it would "undertake . . . any necessary modification to public facilities on a pro-rata basis." The application stated that no zoning change would be necessary for the Development, but did not address the Development's relationship to the County's Comprehensive Plan as requested in the application form.

The Town's Technical Review Committee compiled comments on the application from various staff members and departments. Comments by these departments expressed concerns that until the "new McDevitt relief sewer is constructed," the additional wastewater produced by the Development could not be served through the Teves pump station, and that "[c]ritical data . . . includ[ing] technical and public facilities systems data, land use implications, and conformance with the Town Comprehensive Plan and the County Comprehensive Plan" were not provided. The comments indicated further that, from a planning perspective, the staff had "serious land use

4

concerns" about providing the service to the Development as an area "not identified on the [Town's] potential water/sewer expansion map," and that service to the Development would require " 'leap-frogging' " because the Property did not front on "Lover's Lane," a road located just outside of and running parallel to the Town's corporate boundary.

The Town's Public Works Committee reviewed the application and staff comments and submitted a report to the Town Council.  The report included as appendices Greengael's application, the staff comments, and a description of the Development.  The report recommended that "Council authorize the Town Manager to request approval . . . from the County for the extension of public water and sewer service to [the Development]."  The report further stated that if "conditional approval is granted," Greengael should have to comply with certain conditions including commissioning analyses of both the water and wastewater systems "with the additional load" that the Development would impose, submitting the analyses to the Town for review, and obtaining approval of a site plan from the County.  Greengael received a copy of the report along with notification of the date of the Town Council's hearing on its request.  The Town Council considered the matter on November 12, 2002 and voted unanimously to deny the application.

On January 30, 2003, Greengael submitted to the County an application for approval of a 12-lot preliminary subdivision plat. The staff of the County Planning Commission reviewed Greengael's subdivision request and issued a report addressing deficiencies in the application, including the omission of a Virginia Department of Transportation study, a storm water study, and the required utility letter. On March 12, 2003, the County Planning Commission held a public meeting during which Egertson presented the report. At the meeting Greengael's principal, Douglas Darling, who had not previously seen the staff report, admitted that he was "sure the comments have great merit, . . . but we haven't addressed them quite frankly yet." The Planning Commission recommended that the Board deny the application based on Greengael's failure to comply with the provisions of the ordinance as identified in the report.

The Board was originally scheduled to review the Planning Commission's recommendation on April 1, 2003; however, Greengael requested and received two deferrals so that it could address the deficiencies mentioned in the report. The hearing was ultimately set for June 3, 2003.

Prior to the Board's meeting on the application, Egertson "wanted to update the information for the Board [regarding the Town's denial of Greengael's request for utility service] to

make sure that the reasons for their denial were still current."  On June 2, 2003, Egertson wrote a letter to J. Brannon Godfrey, the Town Manager, asking for confirmation that the Town Council had denied a staff-recommended, conditional approval of Greengael's application and asking whether Greengael had addressed the staff's conditions for approval, notably performing impact analyses of the proposed Development upon the Town's water and sewer systems and offering a plan to fund all or part of any necessary improvements to the infrastructure.  Godfrey responded that same day, stating that "conditions . . . remain unchanged."

At its June 3 meeting, the Board reviewed the Planning Commission's report and the letters Egertson and Godfrey exchanged.  The Board unanimously denied Greengael's application.  At that same meeting, the Board entered into a Water and Sewer Agreement (formal agreement) with the Town which rescinded the Memorandum of Understanding and required the Town to sell to the County available excess water and sewer capacity, "in amounts to be determined solely at the discretion of the County," so that the County could extend such services to commercial and industrial users in the County.

On July 1, 2003, the Board passed a resolution directing the Planning Commission to make recommendations with regard to

rezoning the Property from R-4 to LI, "Light Industrial."

According to the resolution, the LI zoning designation was

"more consistent" with the surrounding parcels.  The Planning

Commission voted to recommend the rezoning on September 10,

2003, and the Board approved the rezoning on October 7, 2003.

PROCEEDINGS

On July 2, 2003, Greengael and Ashmeade Company, L.L.C.,

(collectively "Greengael") filed an appeal and bill of

complaint appealing the Board's decision denying approval of

the subdivision application pursuant to Code § 15.2-2260(E)

and seeking a declaratory judgment, monetary damages, and

injunctive relief against the Board and its members in their

individual and official capacities, the Culpeper County Water

and Sewer Authority and its members in their individual and

official capacities, the Planning Commission and Egertson in

his individual and official capacity as Planning Director, and

the Town Council.  Each defendant filed a demurrer and plea of

sovereign immunity.  The Board demurred to all counts except

Count I, Greengael's appeal of the denial of the subdivision

application, asserting that all claims for monetary damages

should be dismissed because Greengael failed to submit them

first to the local governing body in accordance with Code

§ 15.2-1248, because Greengael did not allege that it lost

either all economic use of or any specific appurtenant right

8

in the Property as a result of the Board's denial of the preliminary subdivision plat, and because a party appealing under Code § 15.2-2260(E) is not entitled to damages. Following a hearing on September 4, 2003, the trial court sustained the defendants' demurrers and pleas for the reasons stated in those pleadings. The trial court also dismissed all defendants except the Board.

On October 8, 2003, Greengael filed its second bill of complaint seeking reversal of the Board's rezoning action, asserting that the Board's action violated the procedural and notice requirements for rezoning. Code §§ 15.2-2204, -285.

The trial court consolidated Greengael's appeal in the subdivision case with its appeal of the rezoning case. Following a bench trial, the trial court issued a letter opinion in which it concluded that the preliminary subdivision plat "should have been approved" and the rezoning should be invalidated, not because the rezoning was unreasonable or a piecemeal downzoning, but because Greengael had vested rights to develop the property under R-4 zoning. The trial court stated:

> The evidence shows that the developer tried
> diligently to obtain the letters, first from the
> County, then from the Town, then again from the
> County. Darling was caught in a bureaucratic
> nightmare in which he was told by the County to go
> to the Town, told by the Town to go to the County,
> told by the County that he could not obtain

9

approval because the Town turned him down, and all the while told by the County that he was wasting his time because the County wanted industrial and not residential development on the site. . . . The County knew when the plan was disapproved that there was in the planning stage improvements to the water and sewer facilities which would in the foreseeable future provide adequate service to the entire Ashmeade project. If Ashmeade had been an industrial project the County itself could have supplied the water and sewer under an agreement between the Town and County, ironically signed the same day as the Board rejected Ashmeade's subdivision, June 3, 2003. . . . An example of how cooperation between the County and the Town results in water and sewer service to projects the County wants to approve may be found in Plaintiff's Exhibit #95. . . . A fair reading of the minutes of the Town Council meeting . . . demonstrates that the Town was willing to make water and sewer available provided the County approved, and provided the developer did studies to help determine exactly what improvements were necessary. The Town's real objective was to coordinate with the County. The County used the Town's action as a shield to avoid approving the plan, knowing that water and sewer soon would be available.

On December 10, 2004, the trial court entered a final order approving the subdivision plat, requiring the County to "work with" Greengael to secure water and sewer from the Town, and invalidating the rezoning to LI use.

The Board appealed from the trial court's rulings approving the preliminary subdivision plat and striking the rezoning of the Property. Greengael assigned cross-error to the trial court's finding that the rezoning was not piecemeal downzoning and its dismissal of "all damage and other counts

10

(except one) of the Bill of Complaint in the Subdivision Case without a hearing on the merits and without leave to amend."

DISCUSSION

I.  Board's Appeal

A.  Approval of Subdivision Plat

We begin with the Board's contention that the trial court erred in reversing the decision of the Board and approving the preliminary subdivision plat.

When a local governing body's decision regarding an application for approval of a preliminary subdivision plat is appealed, a trial court must sustain the decision unless the local governing body failed to comply with the applicable subdivision ordinances or acted arbitrarily and capriciously in denying the application.  Code § 15.2-2260(E); Hanover County v. Bertozzi, 256 Va. 350, 355, 504 S.E.2d 618, 620 (1998).  On appellate review, the trial court's judgment is presumed correct and will not be set aside unless the judgment is plainly wrong or unsupported by the evidence.  Ravenwood Towers, Inc. v. Woodyard, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992).

The Board claims that the trial court did not make an explicit finding that the Board either failed to comply with the applicable subdivision ordinances or acted arbitrarily and capriciously.  Regardless, the Board asserts that it rejected

11

Greengael's preliminary subdivision plat based on the undisputed fact that Greengael failed to comply with the requirement of the subdivision ordinance regarding submission of the utility letter. Therefore, the Board contends that its action was in accordance with the subdivision ordinance, was not arbitrary and capricious, and should have been sustained by the trial court.

Greengael claims that the trial court's discussion in its letter opinion of the actions of the Board and County officials constituted a finding of arbitrary and capricious behavior sufficient to justify reversal of the Board's decision. The premise of Greengael's argument and the trial court's decision is that although Greengael "diligently" tried to obtain the utility letter from both the County and the Town, the Board and County officials manipulated the subdivision process to prevent Greengael from obtaining the utility letter and to avoid approving the subdivision plat for residential use. Greengael supports this conclusion by citing the trial court's recitation that the Board knew that ongoing improvements to the infrastructure surrounding the property would make adequate water and sewer services available in the "foreseeable future," the Board wanted to service industrial and commercial users with water and sewer as evidenced by its formal agreement with the Town executed the same day as the

denial of Greengael's subdivision application, and finally the Board used the Town's denial of Greengael's application as a "shield" for the Board's own denial, when a fair reading of the Town Council's meeting minutes indicated the Town only denied the application because it wanted to cooperate with the Board to bring service to the Development.

Although we accord the trial court's findings of fact a presumption of correctness, Sansom v. Board of Supervisors, 257 Va. 589, 595, 514 S.E.2d 345, 349 (1999), we conclude that the record in this case does not support the trial court's conclusion that the Board manipulated or "used" the Town's actions as a "shield" to avoid approving the application, nor does it support the conclusion that the Board otherwise acted arbitrarily and capriciously in denying the application.

Greengael argues, and the trial court's letter opinion implies, that County officials were involved in Greengael's failure to secure the utility letter. The record does not support this proposition. The County denied Greengael's initial request for water and sewer service because of the undisputed fact that the County operated no such service beyond that to its airport and because it had no formal agreement with the Town to resell such service to County customers. Though the Town, which Greengael next approached to request service, did operate water and sewer facilities, it

13

was not required to provide service to customers in the County located outside Town boundaries.  Provision of such utility services is a proprietary decision, exercised at the discretion of a town.  Town of Rocky Mount v. Wenco of Danville, Inc., 256 Va. 316, 320, 506 S.E.2d 17, 20 (1998).

As the trial court observed, the minutes of the Town Council's meeting regarding Greengael's application to the Town include a discussion as to whether, under the Memorandum of Understanding then in place between the County and the Town,[3] Greengael's request for water and sewer service should first be presented to the County to determine whether the County wanted to provide the service; however, nothing in the minutes indicates that the County influenced this discussion or the vote of the Town rejecting the request.[4]  Accordingly, the record, while showing that the Town wanted to cooperate with the County, illustrated that such cooperation was related

---

[3] The Memorandum of Understanding addressed the ability of the County to provide water and sewer service directly to customers through a proposed capacity purchase from the Town. It did not address County approval of utility service the Town proposed to provide to County customers.

[4] The Board assigned error to the admission of the minutes of the Town Council arguing that the action of the Council was legislative and the opinions expressed in the minutes were irrelevant.  As stated, the action of the Council was a discretionary, proprietary act and the trial court did not err in admitting the minutes into evidence.  See Wenco, 256 Va. at 319, 506 S.E.2d at 19.

14

to process, not to rejection of the request for water and sewer service.

Regardless of the Town's reasons for rejecting Greengael's request, nothing in the record supports the conclusion that the County "manipulated" this process. The record shows that from the time of Egertson's letter until the Town's denial of Greengael's request for water and sewer services, there was no communication between Town and County officials or any of their respective agents.[5] Thus, there is no support for the trial court's finding that members of the Board or County officials influenced the Town's decision to reject Greengael's application for water and sewer services.

Greengael cites several other circumstances referenced in the trial court's letter opinion to support the trial court's decision. First, the County denied Greengael's application with knowledge that the upgrades to the Town's utility services were "in the planning stage" and would "in the foreseeable future" provide adequate service to the development. The trial court further commented that based on the formal agreement between the County and Town signed "ironically" the same day the County rejected Greengael's application, the County could have provided the service itself

---

[5] Egertson testified he learned of the Town's decision from a newspaper article.

15

if the Development was an industrial project. Neither of these circumstances supports a conclusion that the County acted in a capricious or arbitrary manner.

The subdivision ordinance does not require that utility facilities be in place at the time an application for preliminary subdivision approval is presented. It only requires that an applicant produce evidence of an agreement to provide such services. Neither the County's knowledge of planned upgrades in Town water and sewer facilities nor the execution or substance of the formal agreement provides an adequate basis for establishing the required assurance that the Town or County could or would provide water and sewer services to the Development.

The record is clear that at the time of Greengael's application, the Town had insufficient wastewater treatment and pumping capacity to serve the Development and would need to undertake significant line extensions, such as the completion of the "new McDevitt relief sewer." Even though certain system upgrades to enhance capacity were in the "planning stage," as the trial court noted, the record is also clear that such system upgrades had not occurred even at the time of trial.

The formal agreement between the County and Town allowed, but did not obligate, the County to purchase capacity from the

16

Town, even for industrial customers. Finally, Greengael's application was originally scheduled for consideration on April 1, 2003. Execution of the formal agreement on the same day the Board rejected Greengael's application, June 3, 2003, was a function of the two deferrals Greengael requested and received for consideration of its application, not a function of nefarious action by the Board.

Greengael also cites as support for the trial court's decision, the trial court's statements that County officials told Greengael that it was "wasting its time" in seeking to develop the Property as residential "because the County wanted industrial and not residential development on the site."[6] Regardless of any statements made by individual county officials, the County had determined in 2000 that commercial and industrial development of the Property was more desirable for the County and amended its Comprehensive Plan accordingly. After the adoption of the Plan, the planned commercial and industrial development in the area was public knowledge to all

_____

[6] Supervisor John Coates stated that because of the comprehensive plan and the industrial and commercial character of developments adjacent to the Property, the Property "to me, presented itself to be industrial property." However, he testified that he voted against the subdivision application "because water and sewer was not available." Supervisor William C. Chase stated he believed the "die was cast" for industrial or commercial development in the area, but he claimed he did not vote to deny Greengael's application on that basis.

17

investors who purchased property, including Greengael.  This preference by the County is not arbitrary or capricious.

Finally, the trial court discussed as part of its rationale examples of "cooperation" between the County, Town, and other developers that resulted in provision of water and sewer service for "projects that the County wants to approve."  Greengael argues that this cooperation resulted in three-party agreements, which the County accepted thereby "waiving" the utility letter requirement.  The County's failure to "waive" the requirement in a similar manner for Greengael or to consider the requirement satisfied by its own investigation, according to Greengael, was arbitrary and capricious.

Greengael's "waiver" argument is unavailing.  The Board cannot waive a provision of a subdivision ordinance.[7]  Code § 15.2-2254 provides that a developer cannot subdivide land "without fully complying with the provisions" of the subdivision ordinance.  See Parker v. County of Madison, 244 Va. 39, 42, 418 S.E.2d 855, 856 (1992).  Any independent investigation regarding the provision of water and sewer service undertaken by the County, regardless of the

_____

[7] Section 960 of the County Subdivision Ordinance allowed for variations or exceptions to general subdivision ordinance regulations under certain circumstances.  See Code § 15.2-2242(1).  However, Greengael did not seek relief from the Board under this section.

18

information acquired, cannot substitute for the written assurance that water and sewer would be provided.[8]

Furthermore, the projects to which the trial court and Greengael refer as examples of "cooperation," including a Lowes Homestore, a Ryan Homes regional office, and a Richmond American Homes residential development, have little in common with the circumstances of this case. While the exhibits and testimony regarding these projects do not always make clear whether the developers first approached the Town or County for service, they do illustrate that each project conformed to the County's Comprehensive Plan, that the Town approved extension of water and sewer service based on its determination that it could presently or in the near future provide adequate water and sewer service to the proposed developments, and that the developers sought County approval for the Town's agreements to extend water and sewer service. In contrast, Greengael's project did not conform to the Comprehensive Plan, Greengael did not receive Town approval of its request for extension of water and sewer service, and Greengael categorically refused to include the County as a party to its negotiations with the Town.[9] The trial court's discussion of cooperation therefore

---

[8] Egertson testified that written approval was always required under the subdivision ordinance.

[9] Correspondence between Town Engineer Stephenson and Greengael's counsel illustrates that Greengael rejected

does not support a finding of arbitrary and capricious behavior on the part of the Board.

In sum, the County had no means of providing water and sewer service to Greengael when asked to do so; the County was not asked to approve or acquiesce in the Town's provision of such service to Greengael; the Town had no obligation to provide water and sewer service to Greengael; and there is no evidence that the County influenced the Town's decision to reject Greengael's application. Because Greengael's application did not contain the utility letter required for approval of a preliminary subdivision application, the Board acted in compliance with the applicable subdivision ordinance in denying approval, and its decision was not arbitrary and capricious. Accordingly, we will reverse that part of the trial court's judgment overturning the Board's decision and approving the preliminary subdivision plat.

### B. Rezoning

The trial court declared invalid the Board's action rezoning Greengael's property from an R-4 designation to an LI

---

Stephenson's suggestion of notifying the County of its request and "research[ing]" whether the County desired to serve the project. Counsel responded that the Town was not legally required to obtain County approval for extensions to County customers and that he desired not to inform the County because the County sought to "use water and sewer as a land use control" and to prevent any development "without a commercial component."

designation, stating that because Greengael "had a vested right to the subdivision plan under the then-current zoning, the Board could not take away that right by rezoning the property." The Board argues that the trial court erred in holding that Greengael had a vested right to develop the proposed subdivision and that even if such right existed, it would not preclude the Board from rezoning the property. The Board is correct.

A local governing body is not precluded from rezoning property because a property owner has established vested rights to use the property in a manner allowed under the former zoning designation but prohibited under the new designation. Code § 15.2-2307 provides that vested rights of a landowner established pursuant to that section "shall not be affected by a subsequent amendment to a zoning ordinance." Vested rights only protect a landowner's right to develop a specific project under existing zoning conditions and allow continuation of the non-conforming use when that zoning designation is amended or changed.

The trial court also erred in holding that Greengael had a vested right to develop the Property as described in the subdivision plan. A landowner has a vested right in a specific use of property if it "(i) obtains or is the beneficiary of a significant affirmative governmental act

21

which remains in effect allowing development of a specific project, (ii) relies in good faith on the significant affirmative governmental act, and (iii) incurs extensive obligations or substantial expenses in diligent pursuit of the specific project in reliance on the significant affirmative governmental act."  Code § 15.2-2307.  The "significant affirmative governmental act" relied upon by the trial court in this case was its own order approving the subdivision plat. Without deciding whether such an order could qualify as a significant affirmative governmental act under Code § 15.2-2307, the claim of a vested right based on that order fails in this case because of our holding reversing such order.

Greengael claims as an alternate argument that the R-4 zoning designation qualified as a significant affirmative governmental act for purposes of establishing vested rights under City of Suffolk v. Board of Zoning Appeals, 266 Va. 137, 580 S.E.2d 796 (2003).  We reject this argument.  In City of Suffolk, the developer and an adjacent property owner requested and received in 1988 a rezoning of their properties from "Rural Residential" to "Planned Development Housing" for the purpose of constructing a mixed commercial and residential development.  Id. at 141, 580 S.E.2d at 797.  Proceeding without the neighbor, the developer then received approval for a Master Land Use Plan and submitted to the City, among other

22

things, a preliminary recreation plan, preliminary site plan, and a traffic study, before the City rezoned the property for commercial or office park use. Id. at 141-42, 580 S.E.2d at 797-98. We held that under Code § 15.2-2307, which lists as a specific governmental act approval by a governing body of "an application for rezoning for a specific use or density," the developer had established vested rights because it obtained the rezoning for "an identifiable property and project." Id. at 146, 580 S.E.2d at 800.

In contrast, the facts of this case contain none of the elements that qualified the 1988 rezoning in City of Suffolk as a significant affirmative governmental act. The R-4 zoning designation was a general rezoning, was not enacted at Greengael's request, and was not directed specifically to Greengael's project.

For these reasons we will reverse that part of the trial court's judgment that Greengael had a vested interest in the subdivision plan and that the rezoning of the property to an LI designation was invalid.[10]

## II. Cross-Error

Greengael raises two assignments of cross-error: (1) The trial court erred in holding that the rezoning of the property

_____

[10] In the light of these rulings, we need not reach the Board's remaining assignment of error.

23

from R-4 to LI was valid and did not constitute illegal piecemeal downzoning; and (2) The trial court erred in granting the defendants' demurrers and pleas and dismissing Counts II through VI of its Appeal and Bill of Complaint without leave to amend and without a hearing on the merits. We consider these in order.

## A. Piecemeal Downzoning

Greengael assigns cross-error to the trial court's finding that the Board's rezoning of its Property was reasonable and not piecemeal downzoning.

When a court reviews the legitimacy of a zoning amendment, it presumes the action is "valid so long as it is not unreasonable and arbitrary." Board of Supervisors of Fairfax County v. Snell Construction Corp., 214 Va. 655, 658, 202 S.E.2d 889, 892 (1974) (quoting Board of Supervisors v. Carper, 200 Va. 653, 660, 107 S.E.2d 390, 395 (1959)). The opponent of the action bears the burden of proving that the action is "clearly unreasonable, arbitrary or capricious, and that it bears no reasonable or substantial relation to the public health, safety, morals, or general welfare." Id., 202 S.E.2d at 892-83. The court will uphold the ordinance if its reasonableness is "fairly debatable." Id., 202 S.E.2d 893.

24

A court conducts a more expansive review, however, when a rezoning is a piecemeal downzoning, which is defined as a rezoning (1) that the local governing body initiates on its own motion, (2) that selectively addresses the landowner's single parcel, and (3) that "reduces the permissible residential density below that recommended by a duly-adopted master plan." Id. at 658, 202 S.E.2d at 893. An aggrieved landowner can make a prima facie case that the rezoning is piecemeal downzoning upon a showing that "since the enactment of the prior ordinance there has been no change in circumstances substantially affecting the public health, safety, or welfare." Id. at 659, 202 S.E.2d at 893. At that point, the burden shifts to the governing body to offer evidence of mistake, fraud, or changed circumstances "sufficient to make reasonableness fairly debatable." Id.

We must first examine whether Greengael established a prima facie case for a piecemeal downzoning. Greengael sufficiently pleads two of the elements of a piecemeal downzoning discussed in Snell: the Board initiated the zoning amendment on its own motion, and it selectively directed that amendment to Greengael's Property. However, the trial court held, and we agree, that Greengael has not established that the rezoning reduced the density of development below that recommended by the Comprehensive Plan. Id.

25

Greengael argues that the rezoning was a piecemeal downzoning because it was "against [Greengael's] will" and violative of what Snell referred to as a landowner's " 'legitimate profit prospects.' "  Id.  According to Greengael, its profit prospects are especially important because this rezoning makes a drastic shift from residential to industrial, rather than simply a change in intensity of land use within the same zoning classification, such as the higher intensity to lower intensity residential change featured in Snell.  Greengael claims that the Property was far more valuable when zoned R-4 and discusses the "glut[] of vacant industrial land [in Culpeper County] with no foreseeable prospects for users."

Greengael's arguments are not availing.  We agree with the trial court that the use of the land, rather than the profit expectation, is determinative of whether a rezoning is a downzoning.  See, e.g., Turner v. Board of County Supervisors, 263 Va. 283, 289, 559 S.E.2d 683, 686 (2002) (finding a piecemeal downzoning partly based on reduction of residential density below that recommended by County's master plan); Code § 15.2-2286(A)(11) (defining downzoning in context of agreements between localities and landowners to mean a zoning action resulting "in a reduction in a formerly permitted land use intensity or density").  Further, we agree

26

with the Board's argument that adopting Greengael's definition of downzoning would require governing bodies desiring to enact zoning amendments to undertake speculative and costly analyses of the future profit potential of the affected properties under multiple development scenarios.

Applying the intensity of use analysis, we find the rezoning was not a downzoning because the LI designation allows more intense coverage of land than the R-4 designation, 50% versus 35% respectively, and more expansive uses than R-4, including manufacturing, dry cleaning, fabricating metal products, printing and publishing, broadcasting, and disposing of waste. We also conclude that in rezoning the Property, the Board acted reasonably. As the trial court ruled, the amendment "brought the property into conformance with the comprehensive plan," which first designated the property as "future industrial" in 2000, and the Board followed proper procedure by first passing a resolution, then considering the Planning Commission's recommendation, and finally holding a public meeting after providing proper notice. Thus, we reject Greengael's assignment of cross-error.

B.  Dismissal of Counts II through VI

Greengael asserts that the trial court erred in sustaining the defendants' demurrers and pleas to Counts II

27

through VI.[11]  Greengael divides the dismissed counts into two categories:  (1) allegations that certain portions of the Culpeper County Subdivision Ordinance were invalid; and (2) allegations that Greengael was entitled to damages for harm it suffered because the County, Board, and Egertson violated principles of due process and equal protection and engaged in willful misconduct.

With regard to the validity of the subdivision ordinance, Greengael pled that Sections 425.3.1 and 425.4.1 of the ordinance were invalid because they

> fail to provide 'reasonable' provisions in that, as applied, they do not permit any installed water and sanitary sewer facilities for residential subdivision that the County arbitrarily and capriciously chooses not to approve.

Greengael argues the provisions were invalid as applied to it because the Board arbitrarily and capriciously chose not to

---

[11] The dismissed Counts asserted claims that provisions of the Culpeper zoning ordinance violated the Dillon Rule and the due process and equal protection provisions of the Virginia and United States Constitutions, (Count II), that in denying the subdivision plat application, the County, Board, and Egertson committed an unlawful taking of Greengael's property in violation of the equal protection and due process clauses of the Virginia and United States Constitutions, (Count III), that the County, Board, and Egertson unlawfully withheld utility service as a mechanism for land use control constituting an illegal moratorium on development, (Count IV), that Egertson committed fraud and acted ultra vires, (Count V), and that the members of the Board and Egertson were liable in their official and individual capacities to Greengael for damages under 42 U.S.C. § 1983, (Count VI).

approve water and sewer facilities.  First, we note that nothing in the cited ordinance provisions involves County approval of water and sewer facilities in conjunction with its approval of a preliminary subdivision plat.  More importantly, Greengael's arguments fail because, as we have concluded, the Board's denial of the preliminary subdivision plat application based on Greengael's failure to comply with these provisions was not arbitrary or capricious.[12]

The second set of allegations Greengael contends the trial court improperly dismissed were the alleged actions of the County, Board, and Egertson that manipulated the subdivision process and constituted fraud and violations of due process and equal protection.  According to Greengael, in finding that "the County and certain of its officials acted in an arbitrary and capricious manner," the trial court "found, in sum, that County conduct constituted willful misconduct."  As we have held, however, the denial of the preliminary subdivision plat was not arbitrary and capricious and, as Greengael conceded at oral argument, claims based on that conduct are moot.

---

[12] We do not consider whether the ordinance provisions are facially invalid, an argument Greengael raised in its brief filed in this Court in support of the trial court's order approving the preliminary subdivision plat.  Greengael did not assert this argument in its pleadings, memoranda, or argument of counsel in the trial court.  Rule 5:25.

Finally, we address Greengael's allegation in its pleading that the denial of the preliminary subdivision plat based on its failure to comply with the requirement of a utility letter was an unconstitutional taking in violation of its rights under the Virginia and United States Constitutions. To establish an unconstitutional taking, a landowner must suffer either a categorical taking or a regulatory taking. A categorical taking is a deprivation of all economic use of property. A regulatory taking "places limitations on land that fall short of eliminating all economically beneficial use [but render an] economic effect on the landowner [and] interfere[] with reasonable investment-backed expectations," among other harms. Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001) (citing Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978)).

Greengael does not assert a categorical taking because it has not been denied all economic use of its property. It does claim that the Board's action resulted in a regulatory taking.

In evaluating allegations of regulatory takings, a court uses the principles originally set out in Penn Central. Id. at 630. Though there is no "set formula" for such evaluations, the United States Supreme Court has identified three "significan[t]" factors: "The economic impact of the regulation on the claimant, . . . the extent to which the

regulation has interfered with distinct investment-backed expectations, . . . and the character of the governmental action."  Penn Central, 438 U.S. at 124.

Though the regulations Greengael challenges were in effect when it acquired the property, this fact does not per se preclude Greengael from raising a regulatory taking claim. Palazzolo, 533 U.S. at 627 (allowing challenge to preexisting regulation when landowner "assert[s] that a particular exercise of the State's regulatory power is so unreasonable or onerous as to compel compensation").[13]  However, in applying the relevant principles, we conclude that Greengael's challenge here has no merit.

The R-4 zoning ordinance requires that residential dwellings be served by an approved public water and sewer system of adequate capacity, operated by a municipality or public service corporation.  The subdivision ordinance requires that written evidence of an agreement to provide such service accompany the request for preliminary subdivision approval.  No credible argument can be made that these regulations place unreasonable restrictions on the use of land

_____

[13] To the extent our decision in Board of Supervisors v. Omni Homes, 253 Va. 59, 68-69, 481 S.E.2d 460, 464-65 (1997), precludes landowners from prevailing on a regulatory taking claim if they acquired their property subject to the ordinance they subsequently challenge as a taking, Palazzolo has overruled that per se preclusion.

31

for residential purposes.  Indeed, in seeking to develop land for residential purposes, one expects that provision of water and sewer service will be necessary.  Reasonable investment-backed expectations for property that does not include such service then necessarily would include an understanding that such service must be acquired or otherwise made available and that risk accompanies the acquisition of that service.  As the trial court stated, Greengael "assumed the risk that there might not be sewer and water available" when it purchased the Property.[14]

### SUMMARY

For the reasons stated, we will affirm the trial court's judgment sustaining the defendants' demurrers to Counts II through VI and dismissing all defendants but the Board of Supervisors and reverse the trial court's judgment approving the preliminary subdivision plat and invalidating the LI zoning ordinance.

Affirmed in part,
reversed in part,
and final judgment.

---

[14] We repeat our previous holding that the denial of the preliminary subdivision plat based on the absence of a utility letter was not arbitrary and capricious, and to the extent Greengael's taking argument is based on the ordinance as applied to Greengael, that argument is rejected.