PRESENT: All the Justices

LOCH LEVAN LAND LIMITED PARTNERSHIP, ET AL.

                                           OPINION BY
v. Record No. 181043                    JUSTICE STEPHEN R. McCULLOUGH
                                           August 22, 2019

BOARD OF SUPERVISORS OF HENRICO COUNTY, ET AL.


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Charles James Maxfield, Judge

Dominion Club Drive is a significant "spine" road that runs through the Wyndham development in Henrico County. HHHunt[1] wishes to extend this road into Hanover County so that it might more profitably develop its properties in Hanover County. Henrico County (the "County") and residents of Wyndham, fearing worsening traffic, opposed extending the road. The County Board of Supervisors removed a portion of Dominion Club Drive from the County's Major Thoroughfare Plan, and later voted to abandon a portion of that road pursuant to the abandonment provisions found in Title 33.2 of the Code. These steps now preclude HHHunt from extending the road into Hanover County.

HHHunt filed suit to challenge these actions. Following a four-day trial, the circuit court ruled in favor of the County. HHHunt appeals, contending that the court below erred in concluding that: (1) HHHunt did not have a vested right to the continuation of Dominion Club Drive under Code § 15.2-2261; (2) HHHunt did not possess constitutionally guaranteed vested rights in the continuation of Dominion Club Drive; (3) the County could rely on the

---

[1] The suit was filed by four plaintiffs: Loch Levan Land Limited Partnership, the original developer of Wyndham, Wellesley Land Limited Partnership and HHH Land, LLC, which purchased land in Hanover County adjacent to the Loch Levan parcels, and HHHunt Corporation, which is currently pursuing development of the Hanover County parcels. For the sake of simplicity, we will refer to the plaintiffs as HHHunt.

abandonment provisions of Title 33.2 to eliminate the extension of Dominion Club Drive; (4) the abandonment was a legislative act subject to the fairly-debatable standard; and (5) the abandonment of the right of way was for a proper public purpose. HHHunt also asserts that the circuit court erred in finding that public opposition alone is a legitimate basis for sustaining the abandonment of HHHunt's right of way. For the reasons noted below, we affirm the judgment of the circuit court in all respects.

BACKGROUND

In 1989, the Henrico County Board of Supervisors ("the Board") rezoned 1,089 acres for a large master-planned community named Wyndham. From the outset, the plan for Wyndham included construction of Dominion Club Drive, a "spine" or collector road which connected Wyndham Park Drive north to the Chickahominy River. The Chickahominy River forms the boundary between Henrico and Hanover Counties. Since 1991, Dominion Club Drive has been depicted on Henrico County's Major Thoroughfare Plan as running through Wyndham and ending at the Hanover County line.

At the time of the 1989 rezoning, HHHunt owned several non-contiguous parcels in Hanover County. The plans for Wyndham showed Dominion Club Drive going to Hanover but did not show any particular development in Hanover. As the circuit court later found, "future development in Hanover County was foreseen but the scope was unknown." From 1989 onward, HHHunt continued to assemble parcels of land in Hanover County with a view to consolidating them and developing them. Following the Board's rezoning in 1989, HHHunt divided the 1,089 acres into 2,400 lots. HHHunt posted a separate bond for the completion of Dominion Club Drive to the Chickahominy in 1992, increased that bond in 2004, renewed it in 2015, and again in 2017.

2

In 1991, the County agreed to a proposal by HHHunt to divide "the portion identified as Phase 1-C" of Dominion Club Drive into two sections. HHHunt made this request to avoid "spend[ing] money until we are going to absolutely use that infrastructure." The County's Planning Department agreed to the proposal, on the condition that "[t]he final portion of Dominion Club Drive must be completed with the development of the property on the west side of this road section, or earlier should circumstances warrant. (completion of the Hanover County portion of the road)." The "property on the west side of this road section" later became the Manor Park subdivision of Wyndham.

On August 6, 1991, the County approved the plat for another subdivision of Wyndham, Wexford. Wexford adjoins the eastern boundary of Dominion Club Drive and the floodplain bordering Hanover. HHHunt recorded the plat. *Id.* On the same day that HHHunt recorded the Wexford plat, HHHunt also recorded a plat for the Wyndham Collector Roads Phase 1C – Section 1. The 1C-1 plat "provides the access to both Wexford and to Manor Park." The 1C-1 plat does not run to the Hanover County line.

When HHHunt recorded the Wexford subdivision plat, it did not dedicate the right-of-way for all of Phase 1-C of Dominion Club Drive to the Henrico County line. Instead, the plat shows that HHHunt reserved the right-of-way for Section 2 of Phase 1-C for "future development." By making this reservation, rather than a dedication, HHHunt avoided the cost of building Section 2 of Phase 1-C as part of the Wexford subdivision.

In 1992, the County approved the plat for the Manor Park subdivision. Manor Park adjoins the western boundary of Dominion Club Drive and the floodplain bordering Hanover. HHHunt recorded the plat for Manor Park. On the same day, HHHunt also recorded the plat for Wyndham Collector Roads Phase 1C – Section 2. As with the 1C-1 plat, the 1C-2 plat only

3

dedicated a right-of-way, but did not subdivide property into lots. The right-of-way on the 1C-2 plat runs from north of Isleworth Drive to the Henrico County line.

HHHunt built the 1C-1 road section. Henrico County accepted it into its road system in August 1992. HHHunt had final plat approval from Henrico and Hanover Counties to connect Dominion Club Drive across the Chickahominy River by completing the portion of Dominion Club Drive shown on the 1C-2 plat. An HHHunt engineer testified that, prior to the abandonment of a portion of Dominion Club Drive, "HHHunt has been at liberty to construct 1-C-2 at any time." Nevertheless, HHHunt never submitted plans to construct the 1C-2 section all the way to the Henrico County line, to cross the Chickahominy River, or to build a connecting road in Hanover. Instead, HHHunt did some clearing and grading, placed a layer of stone on part of the 1C-2 section, and erected a barrier at the end of the 1C-1 section to prevent the public from using the 1C-2 right-of-way. The public cannot travel over the 1C-2 right-of-way. In 1996, HHHunt asked Henrico to release the bond that guaranteed completion of the 1C-2 section. HHHunt explained that "[t]his project has been postponed indefinitely." In 2012, Hanover County made Dominion Club Drive part of its Major Thoroughfare Plan.

In 2016, HHHunt filed a rezoning application with Hanover County for its properties in that County. Alarmed at the prospect of increased traffic flowing in from Hanover County, Wyndham residents became vocal in their opposition to extension of Dominion Club Drive into Hanover. On November 9, 2016, the Board voted to remove the incomplete portion of Dominion Club Drive from the Major Thoroughfare Plan. On February 28, 2017, the Board conducted a hearing to determine whether the County should abandon the unbuilt, barricaded portion of Section 1 of Phase 1-C of Dominion Club Drive. The County's Director of Public Works explained why there was no public necessity to continue this portion of Dominion Club Drive

4

and why its abandonment would be best served by abandoning this section of road. The Board voted to abandon it.

HHHunt filed a complaint challenging the Board's November 2016 action to remove a portion of Dominion Club Drive from the County's Major Thoroughfare Plan. HHHunt later filed a separate complaint challenging the Board's February 2017 decision to abandon the portion of Dominion Club Drive that is currently a dead-end. Both cases were consolidated for trial. Following a four-day trial, the circuit court ruled in favor of the Board.

The circuit court concluded that Code § 15.2-2261(C) controlled rather than Code § 15.2-2261(F). Consequently, the court found that HHHunt's statutory right to fully build Dominion Club Drive was limited to five years. The circuit court also rejected HHHunt's claim of a constitutionally vested right to build a road. The court held that, under Virginia law, "a landowner may have a constitutional vested property right in the use of its land provided [it] diligently pursues a permitted use." The court concluded, however, that HHHunt's claim failed because "the 25-year gap between the road dedication and the board's action does not evidence diligent pursuit." The court held that "[n]o public necessity or public welfare consideration will be served by maintaining the short section of road at issue." Finally, the court found that the Board's decision to abandon the unbuilt segment of Dominion Club Drive was not arbitrary or capricious. This appeal followed.

ANALYSIS

I.      Code § 15.2-2261(C) is the controlling statute and it provided HHHunt five years to complete construction of Dominion Club Drive.

HHHunt argues that the circuit court erred in its interpretation of Code § 15.2-2261, and that a proper reading of the statute establishes its right in perpetuity to develop all of Dominion

5

Club Drive. On appeal, we review a trial court's statutory interpretation de novo. *Mercer v. MacKinnon*, 297 Va. 157, 162 (2019).

Two related statutes govern our disposition of this issue. Code § 15.2-2261(C) provides that

> For so long as the final site plan remains valid in accordance with the provisions of this section, **or in the case of a recorded plat for five years after approval**, no change or amendment to any local ordinance, map, resolution, rule, regulation, policy or plan adopted subsequent to the date of approval of the recorded plat or final site plan shall adversely affect the right of the subdivider or developer or his successor in interest to commence and complete an approved development in accordance with the lawful terms of the recorded plat or site plan unless the change or amendment is required to comply with state law or there has been a mistake, fraud or a change in circumstances substantially affecting the public health, safety or welfare.

(Emphasis added.)

Code § 15.2-2261(F) provides that

> An approved final subdivision plat that has been recorded, from which any part of the property subdivided has been conveyed to third parties (other than to the developer or local jurisdiction), shall remain valid for an indefinite period of time unless and until any portion of the property is subject to a vacation action as set forth in §§ 15.2-2270 through 15.2-2278.

Code § 15.2-2261(C) thus provides that a recorded plat remains valid for five years after approval, and that a locality may not adversely affect the right of a developer to commence and complete the subdivision. Code § 15.2-2261(F) extends that right to "an indefinite period of time" (except for a vacation action) if the recorded plat was one "from which any part of the property subdivided has been conveyed to third parties."

Like the circuit court, we conclude that HHHunt's right to develop Dominion Club Drive was limited to five years. In 1992, HHHunt recorded a separate, specific plat designated 1C-2,

6

for the sole purpose of dedicating a right-of-way to complete Dominion Club Drive to the Henrico County line.  Under the plain language of Code § 15.2-2261(C) this was the "recorded plat" that was valid for five years.  Because HHHunt did not complete the road in five years, its statutory rights to complete this road had expired.

Code § 15.2-2261(F) covers the situation where "[a]n approved final subdivision plat that has been recorded, *from which any part of the property subdivided has been conveyed to third parties*."  (Emphasis added.)  In that circumstance, the approved final subdivision plat "shall remain valid for an indefinite period of time."  HHHunt did obtain approval for a final subdivision plat, but the relevant plat is the 1C-2 plat.  That plat was for a portion of Dominion Club Drive and did not convey any part of the property subdivided to any third parties.  Accordingly, Code § 15.2-2261(F) does not apply.

HHHunt challenges this straightforward textual interpretation of these Code sections with a number of arguments.  First, it contends that, under the plain language of Code § 15.2-2261(C), where a developer has obtained "final" approval of a project, no change in local ordinance, policy or plan can adversely impact the right of the developer "to commence and complete an *approved development* in accordance with the lawful terms of the recorded plat or site plan."  The "approved development" in this case, HHHunt argues, "is Wyndham and it was first approved by Henrico County in 1989."  We do not agree.

"[C]ourts have a duty to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal.  A statute is not to be construed by singling out a particular phrase."  *City of Richmond v. Va. Elec. & Power Co.*, 292 Va. 70, 74 (2016).  The focus of Code § 15.2-2261 is on individual subdivision plats and site plans.  The most logical construction of the words "approved development" in Code § 15.2-2261(C) is that

7

they refer to the development shown on the recorded plat, in this instance the 1C-2 plat. The County's interpretation is consistent with the idea, often referred to by the Latin phrase *noscitur a sociis*, under which

> the meaning of doubtful words in a statute may be determined by reference to their association with related words and phrases. When general words and specific words are grouped together, the general words are limited and qualified by the specific words and will be construed to embrace only objects similar in nature to those objects identified by the specific words.

*Andrews v. Ring*, 266 Va. 311, 319 (2003) (citation omitted). Moreover, as the County points out, accepting this argument would render superfluous the words "in accordance with the lawful terms of the recorded plat." *See* Code § 15.2-2261(C). "We ordinarily resist a construction of a statute that would render part of a statute superfluous." *Davis v. MKR Dev., LLC*, 295 Va. 488, 494 (2018). The words "approved development" do not bear the weight HHHunt seeks to place on them.

We are not convinced by HHHunt's claim that the "clear intent of the statute" is to "protect a developer's vested rights in the overall development – not just constituent parts of the development." As noted above, the plain language of the statute tethers the right to commence or complete a subdivision to "plats" and "site plans." The plain language of the statute also differentiates between a recorded plat "from which any part of the property subdivided has been conveyed to third parties," and a recorded plat where no such conveyance has occurred. *Compare* Code § 15.2-2261(C), *with* Code § 15.2-2261(F). The statute does not use the words "overall development."

We also reject the claim that this interpretation of Code § 15.2-2261 would lead to absurd results. HHHunt posits that it cannot be the legislature's intent to allow a subdivision plat to have unlimited validity while limiting to five years the validity of the road plats that service the

8

subdivision. A locality, the argument goes, could thus stop a development by the expedient of simply eliminating access to it. First, under Code § 15.2-2261(C), developers have the right to "commence and complete" a road within the five-year period. A five-year period is a significant period for a developer to complete a road. Furthermore, developers can dedicate access roads on the same plat as the subdivision plat, thereby extending the indefinite right under Code § 15.2-2261(F) to the access roads. Finally, in the unlikely event a locality might seek to cut off road access to a platted, approved subdivision, Code § 33.2-920 allows a court to step in and override a locality's decision to abandon a road when a public necessity exists for that road. HHHunt's attempt to conjure the prospect of stranded, roadless subdivisions is thus unpersuasive.

Moreover, although we have recognized that a statute should not be interpreted in a manner that leads to absurd results, "absurd" in this context does not mean "bad policy" or "a result a litigant really, really does not like." "[O]ur case law uses the phrase 'absurd result' to describe situations in which the law would be internally inconsistent or otherwise incapable of operation." *Cook v. Commonwealth*, 268 Va. 111, 116 (2004). "Here, it is entirely possible to carry out the law as written in unambiguous terms in a manner consistent with the General Assembly's apparent intent." *Id.*

HHHunt further argues that Dominion Club Drive is "associated directly and inextricably" with certain subdivisions, specifically, Manor Park and Wexford.[2] However,

---

[2] The record does not support HHHunt's argument that the completion of Dominion Club Drive to the Hanover County line was a condition for the construction of the Wexford and Manor Park subdivisions. The recorded plats for both subdivisions do not contain any condition requiring completion of the road to the Hanover county line. The record also refutes any contention that Henrico County's Planning Department conditioned approval of the plat upon completion of the road.

9

HHHunt made the decision to record the 1C-2 plat separately from those subdivisions. It could have dedicated the entirety of Phase 1C-2 of Dominion Club Drive on the Wexford plat but it did not. In addition, the Wexford and Manor Park subdivisions have long been completed without the construction of the portion of road shown on the 1C-2 plat, so the claimed inextricable link is missing.

Finally, HHHunt argues that Code § 15.2-2209.1(A) preserves its right to extend Dominion Club Drive. That statute provides in relevant part as follows:

> Notwithstanding the time limits for validity set out in §§ 15.2-2260 or 15.2-2261 . . . any recorded plat or final site plan valid under § 15.2-2261 and outstanding as of January 1, 2017, shall remain valid until July 1, 2020. . . . Any other plan or permit associated with such plat or site plan extended by this subsection shall likewise be extended for the same time period.

According to HHHunt, "the Wexford and Manor Park plats are valid and fall within the scope of § 15.2-2261(F)." Appellant Br. at 30. Therefore, HHHunt argues, any associated 'plans or permits,' such as the road dedication plat for 1C-2, which clearly show Dominion Club Drive, also remain valid at least through January 1, 2020. However, the 1C-2 road dedication plat is not "associated" with the Wexford or Manor Park plats as Code § 15.2-2209.1(A) contemplates because HHHunt made the decision to separately record it and chose not to build the road for an extended period of time. Also, a "plan or permit" within the intendment of Code § 15.2-2209.1(A) means documents like erosion and sediment control plans, Code § 62.1-44.15:55, stormwater management permits, Code § 62.1-44.15.34, or building permits, Code § 62.1-44.15:34. By contrast, the 1C-2 plat is a "plat" – not a "plan or permit." The Code distinguishes between the two. Code § 15.2-2209.1 does not apply.

When HHHunt obtained the rezoning for Wyndham in 1989, it plainly expected to extend Dominion Club Drive into Hanover County at some indefinite point in the future. Its legal right

10

to do so, however, expired five years after recording the plat for the final stretch of road that would accomplish this objective. HHHunt could have submitted construction plans and built this portion of road within five years of recording the plat for Phase 1C-2 of the road. Furthermore, as the County concedes, HHHunt could have dedicated the entire Phase 1C-2 right-of-way when it recorded the Wexford subdivision plat, and had it done so it would have gained an indefinite right under Code § 15.2-2261(F) to extend Dominion Club Drive to the Hanover County line. HHHunt chose a specific course of action, which was to proceed incrementally and to record separate plats for distinct segments of Dominion Club Drive. That course of action triggered specific statutory protections and foreclosed others. HHHunt's election to segment the plats for Dominion Club Drive allowed it to avoid "spend[ing] money" to complete the road, but it lost the indefinite protection offered by Code § 15.2-2261(F).

> II. HHHunt has no constitutionally vested right in the continuation of Dominion Club Drive.

HHHunt also claims a constitutionally vested right to develop Dominion Club Drive to the Hanover County line. The Constitution of Virginia recognizes as "inherent rights" "the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." Va. Const. art. I, § 1. Respect for, and protection of, private property has been a cornerstone of our Nation's liberty and prosperity. The Commonwealth's constitution further recognizes, however, that the people elect representatives to legislate "for the common benefit, protection, and security of the people." Va. Const. art. I, § 3. From colonial times to the present day, legislative bodies have regulated private property for the common good. *See, e.g.*, Hening's Statutes at Large 152 (March 1629-30) (requiring the landowners to plant corn to ensure the colony had a sufficient supply of food).

11

The Constitution of Virginia, like its federal counterpart, imposes limits on a government's exercise of its police powers. They both forbid the deprivation of property without due process of law. U.S. Const. amend. XIV; Va. Const. art. I, § 11. The United States Supreme Court has recognized the need for compensation when a "regulatory taking" has occurred, that is, when regulatory demands become confiscatory. *See, e.g., Murr v. Wisconsin*, 137 S. Ct. 1933 (2017). In addition, although the standard of review is deferential to governmental action, the Constitution forbids irrational laws. *Compare St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013) *with Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 286 (2d Cir. 2015).

HHHunt does not inform us what provision of the Constitution of Virginia has allegedly been infringed. Instead, it seeks to analogize its right to build a road under the statutes at issue to vested rights principles that apply in zoning cases. We have recognized a landowner's "right to develop a specific project under existing zoning conditions and allow continuation of the non-conforming use when that zoning designation is amended or changed." *Board of Sups. v. Greengael, L.L.C.*, 271 Va. 266, 282-83 (2006). The present context, however, is quite different from zoning.

"A vested right in a land use is a property right which is created and protected by law." *Holland v. Johnson*, 241 Va. 553, 556 (1991). The vested rights doctrine is inapplicable where there is no underlying property right for the constitution to protect. We have recognized that, in the zoning context, a landowner has no vested rights in the zoning classification or land uses of his or her neighbor, that is, in land the landowner does not own. *Town of Leesburg v. Long Lane Assocs., Ltd. P'ship*, 284 Va. 127, 136 (2012). In addition, we have held that there is no vested right in a public road. *Board of Sups. of Louisa Cnty. v. Virginia Elec. & Power Co.*, 213 Va. 407, 412 (1972); *see also Smith v. Board of Sups.*, 201 Va. 87, 93-94 (1959). Here, the

12

dedication of a road "shall operate to transfer, in fee simple, to the respective localities in which the land lies the portion of the premises platted as is on the plat set apart for streets, alleys or other public use." Code § 15.2-2265. HHHunt had no property right in Dominion Club Drive once it dedicated that road. By law, the County owned the road in fee simple.

Our cases foreclose the argument that HHHunt can have a vested property right in the continuation of a public road. It had a *statutory* right to construct the road within five years. It forfeited that right through inaction.

III.    The County lawfully abandoned a segment of Dominion Club Drive and the evidentiary record supports its decision.

A.    The County could rely on the provisions of Title 33.2 to abandon the extension of Dominion Club Drive.

The County's argument is straightforward: by statute, a locality may elect to abandon a road that is part of its road system. *See* Code § 33.2-915(A). Dominion Club Drive is part of the County road system. The County contends that it availed itself of the procedure under Title 33.2 to abandon a stretch of Dominion Club Drive and it did so in a manner that satisfied statutory requirements. HHHunt responds that the County used the wrong Code provision. It asserts that Title 33.2 is not the proper statutory mechanism to abandon a portion of a road. Instead, it contends, the County should have used the procedures in Title 15.2.

Under Code § 15.2-2261(F), a recorded subdivision plat is valid indefinitely unless it is vacated under the provisions found in Title 15.2. Code § 33.2-925 provides that "[a]s an alternative to the procedure for abandonment prescribed by this article, a road may be abandoned in accordance with the procedure for vacations in subdivision 2 of § 15.2-2272." Code § 33.2-925 specifically provides that "the procedure for vacations in subdivision 2 of § 15.2-2272" is an "alternative" way to abandon a road. Code § 15.2-2261(F) thus cannot be the

13

exclusive way to abandon a road. The General Assembly thus expressly provided that the procedures can be employed in the alternative, at the option of the locality. We are not at liberty to ignore this statutory language. Additionally, this is not a case under which the County seeks to vacate a subdivision. Accordingly, the County could elect to proceed under the abandonment provisions found in Title 33.2.

> B. The circuit court properly sustained the Board's decision to abandon a portion of Dominion Club Drive.[3]

We turn next to the substance of HHHunt's challenges to the County's decision to abandon a portion of Dominion Club Drive. In determining whether to abandon the road, the County Board of Supervisors was required to find that the road is "no longer necessary for public use" and to consider "the historic value, if any, of such a road." Code § 33.2-915. In addition, Code § 33.2-919 requires consideration of whether a "public necessity exists for the continuance of the section of road . . . or that the welfare of the public would be served best by abandoning the section of road."

In deciding to abandon a portion of Dominion Club Drive, the Board reviewed the history of the road, cited relevant Code provisions, and noted that this particular section of road "has not been extended northward, does not connect to a road for public passage north of Isleworth Drive, and ends at a graveled cul-de-sac bounded by a gate." Clearly, the Board considered the facts and the law.

In reviewing the propriety of the County's action, the circuit court must "determine whether public necessity exists for the continuance of the section of road . . . as a public road . . .

---

[3] Code § 33.2-920 requires a circuit court to review a decision to abandon a road "de novo." The circuit court repeatedly stated that it was conducting a "de novo review." HHHunt's argument that the circuit court employed a standard other than de novo is unpersuasive.

14

or whether the welfare of the public will be served best by abandoning the section of the road . . . as a public road." Code § 33.2-920. The use of the word "or" indicates a legislative intent to allow a road to be abandoned *either* if no public necessity exists for the continuance of the section of road or if the welfare of the public will be served best by abandoning the section of the road. *See Smith*, 201 Va. at 89 ("[T]he statute is in the disjunctive, and the road may be abandoned if either requirement is met.").

The circuit court heard evidence over the course of four days. It concluded that "[p]ublic opposition, safety concerns, and intersection failure are all proper concerns for the board's decision, and they cannot be seen as arbitrary and capricious."[4]

HHHunt asserts that the County had no rational basis to abandon the road. It claims that the County acted simply to appease politically active residents. Furthermore, it contends that extending Dominion Club Drive would benefit Wyndham residents who are aging by facilitating an option for them to move into an age-restricted community nearby. It proffered traffic studies showing a minimal impact on traffic in the Wyndham subdivision. Moreover, it argues that an increase in traffic had been anticipated long ago and Dominion Drive was designed and built to accommodate such traffic. It also points out the County's absence of traffic studies.

First, it is worth noting that the "road" Henrico County abandoned was not an actual road the public could use for travel. HHHunt did some clearing and grading and placed a layer of stone on part of the road depicted on the 1C-2 plat. The road is an impassable dead end. It is not open to the traveling public and has never been open. Certainly, no *present* public necessity

---

[4] The circuit court rested its decision on three grounds: public opposition, safety concerns, and intersection failure. HHHunt's argument that the court below found "that public opposition *per se* is a legitimate basis for sustaining the abandonment of a road" is without support in the record. The circuit court did not rest its decision on public opposition alone.

15

exists for the continuation of such a "road." No residents or existing businesses will be stranded. *Future* convenience might militate in favor of the continuance of such a road, but that convenience must be weighed alongside the detriment of increased congestion in a residential subdivision and the prospect of still more congestion in the future.

Second, although HHHunt dismissively portrays opposition from Wyndham residents to the extension of Dominion Club Drive as groundless and irrational, residents' worries were certainly relevant to the Board's decision. The intersection of Dominion Club Drive and Wyndham Park Drive was already a source of frequent backups. Additional traffic would add to residents' existing woes. Every minute spent in traffic is a minute that is no longer available for family, work, or leisure. Residents' concerns over the quality of life in their neighborhood were hardly the stuff of blind, irrational prejudice. As the United States Court of Appeals for the Fourth Circuit trenchantly but aptly observed in an analogous context,

> It is not only proper but even expected that a legislat[ive body] and its members will consider the views of their constituents to be particularly compelling forms of evidence, in zoning as in all other legislative matters . . . .
>
> Indeed, we should wonder at a legislator who ignored such opposition. In all cases of this sort, those seeking to build will come armed with exhibits, experts, and evaluations. Appellees, by urging us to hold that such a predictable barrage mandates that local governments approve applications, effectively demand that we interpret the Act so as always to thwart average, nonexpert citizens; that is, to thwart democracy.

*AT&T Wireless PCS v. City Council of Va. Beach*, 155 F.3d 423, 430-31 (4th Cir. 1998).

Third, evidence besides public opposition supports the circuit court's decision. Michael Jennings, the Assistant Director of Public Works, testified that, on weekday mornings, traffic at the intersection of Dominion Club Drive and Wyndham Park Drive backs up "almost four, five hundred feet." He opined that an increase in traffic on Dominion Club Drive would cause the

16

intersection of Dominion Club Drive and Wyndham Park Drive to "fail miserably." Three professional engineers testified that the extension of Dominion Club Drive would create safety issues in Wyndham. They mentioned an increased risk of accidents, access problems for emergency vehicles, "more conflicts" with pedestrians at crosswalks, and difficulty in crossing congested roads.

As to HHHunt's traffic studies, the County presented evidence that undermines the strength of their conclusions. The County presented evidence that the studies undercounted potential traffic. The County also presented evidence of plans, such as Hanover County's Major Thoroughfare Plan and plans for business development, that would cause traffic to flow into Wyndham should Dominion Club Drive be open to traffic from that direction. It was for the circuit court to evaluate the credibility of the conflicting evidence presented.

The record shows that the Board's decision was not arbitrary or capricious. The circuit court properly exercised its de novo review of the Board's decision and correctly sustained that decision.

CONCLUSION

For all these reasons, we will affirm the judgment of the circuit court.

*Affirmed*.